The STATE of Ohio, Appellant,

v.

HEATH, Appellee.

[Cite as *State v. Heath*, 170 Ohio App.3d 366, 2007-Ohio-536.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 86724.

Decided Feb. 8, 2007.

William D. Mason, Cuyahoga County Prosecuting Attorney, and Jon W. Oebker and Mark J. Mahoney, Assistant Prosecuting Attorneys, for appellant.

Synenberg & Associates, L.L.C., Roger M. Synenberg, and Dominic J. Coletta, for appellee.

SEAN C. GALLAGHER, Judge.

{¶ 1} Appellant, the state of Ohio, appeals the sentence of community control imposed upon appellee, Traci Heath ("Heath"), for two first-degree felonies in the Cuyahoga County Court of Common Pleas. For the reasons stated below, we vacate the sentence imposed and remand the cause for resentencing pursuant to R.C. 2953.08(G)(2)(a).

{¶ 2} Heath was indicted on September 15, 2004, with one count of conspiracy to commit aggravated murder in violation of R.C. 2923.01 and 2903.01, and one count of attempted aggravated murder in violation of R.C. 2923.02 and 2903.01. Both charges were first-degree felony offenses that carried a presumption of incarceration pursuant to R.C. 2929.13(D). The indictment alleged that Heath hired a "hit man"[1] to kill her husband, Joseph Heath, for the price of $12,000.

{¶ 3} Heath ultimately pleaded guilty to both counts as charged. The case proceeded with an initial sentencing hearing on June 15, 2005. The trial court sentenced Heath to five years of community control sanctions, with the conditions that she continue psychological counseling, obtain and maintain verifiable full-time employment, and refrain from all use of drugs and alcohol except prescribed medication. The court also ordered the $12,000 that was paid to the "hit man" be returned to Heath, apparently to be used for her daughter's college education.[2]

{¶ 4} The state has appealed the sentence, raising two assignments of error for our review.

{¶ 5} The assignments of error provide as follows:

---

1. The "hit man" was actually an undercover police officer.

2. The state objected on the record to this order at the time of the initial sentencing; however, no assigned error was raised regarding the return of these funds.

{¶ 6} "I. The trial court erred when it failed to make the required statutory findings and state its reasons for not imposing a prison term."

{¶ 7} "II. The trial court erred in sentencing defendant to a community control sanction when the statutory presumption in favor of a prison term was not overcome."

{¶ 8} A review of the initial sentencing transcript revealed that the trial court set forth reasons for imposing community-control sanctions; however, the trial court failed to make the required statutory findings outlined under R.C. 2929.13(D). Specifically, the trial court did not make findings that a sentence of community-control sanctions would adequately punish the offender and protect the public from future crime and not demean the seriousness of the offense.

{¶ 9} As a result, this court ordered a limited remand on April 24, 2006, pursuant to R.C. 2953.08(G)(1), for the sole purpose of allowing the trial court to make the required findings explaining why it overrode the presumption of prison for the first-degree felonies as required under R.C. 2929.13(D).

{¶ 10} As an initial matter, we note that although the Ohio Supreme Court has held that judicial findings are no longer mandated in many instances, they are still required for downward departures, such as when a court refuses to impose the presumptive prison term under R.C. 2929.13(D). *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1.[3] As stated in *Mathis*, "When findings under R.C. 2929.13(D) or 2929.20(H) are missing from the appellate record, the appellate court shall remand the case to the sentencing court to state on the record the required findings pursuant to R.C. 2953.08(G)(1), after which the appellate court shall either affirm or modify the sentence, or vacate the sentence and remand the case for a hearing de novo if the sentence is contrary to law."

{¶ 11} Following the remand, the trial court resentenced Heath on June 1, 2006, to the same five-year community control sanctions with the same conditions that were originally imposed. The court outlined its reasons and made findings for imposing the sentence on the record.

{¶ 12} The case has now returned to the appellate court for a review of the assignments of error initially raised by the state. We note that the state's first assignment of error was resolved by virtue of our limited remand and resulting resentencing. Thus, appellant's first assignment of error is overruled as moot.

---

**3.** Unaffected by the Ohio Supreme Court's ruling in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, are appeals by the state, as a matter of right, for sentences in which no prison term was imposed despite the presumption favoring prison for certain offenses, or for judicial modification of sentences for a first- or second-degree felony under R.C. 2929.20.

{¶ 13} We also note that on July 3, 2006, the state initiated a second appeal in case No. 88391 following the resentencing, involving the same underlying facts initially appealed in case No. 86724. Apparently, the state erroneously believed it had to file a new appeal to preserve its rights after the resentencing hearing held by the trial court following the limited remand. On September 25, 2006, the appeal in case No. 88391 was dismissed as a duplicate of the appeal filed in case No. 86724.

{¶ 14} The convictions in this case arose out of an almost surrealistic set of facts involving the marriage of Heath and her now former husband, Joseph Heath. While there are disputes as to who was responsible, and to what degree, the record in this case reveals a dysfunctional marriage with ongoing allegations of alcoholism, adultery, and physical and emotional abuse, coupled with a wide range of mental health issues.

{¶ 15} The record reveals that Heath had a troubled childhood that reportedly included physical, emotional, and sexual abuse. Heath reported that she was raised by violent and physically abusive parents who were alcoholics. She was purportedly sexually molested between the ages of 12 and 14 by her mother's boyfriend and members of his family after her parents' marriage ended. Heath began to date Joseph Heath when she was 16 years old. They were married when Heath was 18 years old. The union produced two daughters, who were teenagers at the time of the events that resulted in these charges.

{¶ 16} Heath and Joseph Heath offered diametrically different views on the problems in their marriage and the events surrounding their breakup. Heath exclusively blamed her husband and described him as a "drinker" with a lot of anger inside that resulted in his being physically and verbally abusive to her throughout their marriage. She often described him as "raging out of control." Joseph Heath, on the other hand, disputed these characterizations and described Heath's claims as "lies" at the initial sentencing.

{¶ 17} The record reflects that despite the ongoing problems in the marriage, the couple did manage to start a successful construction business and maintain a home for their daughters for most of the marriage. By 2002, however, the marriage was in serious trouble. That same year, the couple tried counseling. Nevertheless, sometime during the counseling period, Heath began a romantic relationship with another man, who was known to the Heaths through their construction business. In the fall of 2002, Joseph Heath moved into the basement of the marital home. By August 2003, Joseph Heath moved out of the marital residence and formally filed for divorce.[4]

---

4. Joseph Heath apparently left the marital home as a result of a restraining order filed by Heath in August 2003. No criminal charges were ever filed against Joseph Heath.

{¶ 18} The specific events that led to Heath's indictment arose out of the contentious divorce proceedings the couple was embroiled in during the summer of 2004. During this period, Heath remained involved with her boyfriend, who the record asserts was a heavy drinker, as well as physically and verbally abusive to her. Heath claimed that during this period, Joseph Heath continued a pattern of harassment and intimidation involving the divorce, the children, and their business. Joseph Heath and the children disputed these allegations.

{¶ 19} At the end of July 2004, Heath had a conversation with her sister, Lisa Gaffney, in which Heath expressed anger with her husband over the divorce proceedings. She told her sister that she had a gun and was going to "kill Joe herself." She repeated this more than 30 times in one hour. She told her sister she was "losing everything." Gaffney was able to calm Heath down, but remained concerned about what Heath might do. After conferring with her friends out of a concern over what might happen, Gaffney contacted Joseph Heath's attorney and advised him of Heath's threats.[5]

{¶ 20} The record during this period identifies three friends who were involved with Heath, two of whom played direct roles in the events leading up to her arrest. The first was Sheila Davis. Coincidentally, Davis was an ex-girlfriend of Heath's current boyfriend. Davis introduced Heath to one of her friends, Dee Hefflin. Heath claimed that Davis told her that Hefflin could help Heath deal with her husband. According to Heath, Hefflin began to contact Heath about having Joseph Heath killed. Hefflin, however, claimed that after they became friends, Heath threatened her into finding a hit man for Heath. After these discussions occurred, Hefflin apparently contacted the North Olmsted Police.[6]

{¶ 21} In early August 2004, immediately after the conversation with her sister, Heath went on a week-long vacation to Montana with a third friend, Luann Keys. Keys was introduced to Heath by Heath's boyfriend. Keys later told the

---

5. The brother of Gaffney and Heath apparently intervened and either took the gun away from Heath or was planning to take it away from her at the time of her arrest.

6. There is some uncertainty in the record as to how this contact took place. The prosecutors involved in this case failed to file a statement of facts outlining how the investigation evolved. Further, they failed to put any evidence on the record or refute any of the findings issued by the trial court at the resentencing hearing. The record before this court contains no police reports or summaries of investigative reports. The prosecutors failed to supplement the appellate record with a copy of the original undercover DVD/videocassette recording, which the trial court, for whatever reason, declined to make part of the record. At the initial sentencing, the prosecutor did file a sentencing memorandum that included a transcript of a DVD/videocassette recording made of two undercover conversations with Heath, as well as copies of written statements from Heath's daughters and Heath's sister, Lisa Gaffney, but these records do not provide an overview of the criminal investigation or a complete summary of Heath's conduct. The primary record in this case is essentially the 28–page psychological report offered by Dr. Kaplan on Heath's behalf.

psychologist evaluating Heath that Heath did not seem upset and did not have difficulty concentrating during their trip to Montana. Keys noted that she was aware that Heath's boyfriend was abusing Heath during this period. Upon returning from the trip, Heath claimed that Hefflin began contacting her to set up a meeting with the hit man.

{¶ 22} Police, through Hefflin, made three attempts between August 10 and August 17, 2004, to set up a meeting between Heath and an undercover police officer acting as a hit man. Two meetings were eventually scheduled and held on succeeding days, August 17 and 18, 2004. They were recorded on videocassette/DVD by the police.[7] These meetings involved Heath and an undercover officer, acting as a hit man, meeting in a parking lot, seated in a truck. Hefflin was the facilitator and was present at both these meetings.

{¶ 23} At the initial meeting on August 17, 2004, Heath provided the undercover agent with photos of her husband. She informed the officer that she had been married to Joseph Heath for 22 years and indicated that he was harassing and stalking her. She claimed she was fearful that he would kill her and indicated he had previously threatened to kill himself. The transcript reflects that when asked what she wanted done with her husband, she responded, "Dead, I want to see him dead." She also discussed a $50,000 life insurance policy covering her husband on which she was listed as the beneficiary.

{¶ 24} The transcript reflects that Heath provided details about where her husband could be located and the type of vehicle he drove. A discussion was held involving the prospect of a shooting "accident" in a wooded area near a barn where the Heaths' construction business was located. Heath discussed paying for the "hit" in "untraceable cash" and indicated the following: "I can't risk getting caught, I can't risk going to jail when somebody, nobody's being there for my kids." She also discussed the fact that she had purchased a Smith and Wesson pistol, but her brother was taking it from her. At this initial meeting, Heath and the undercover officer agreed to a price of $12,000 cash for the "hit," with Heath paying $6,000 up front and Hefflin holding the remaining $6,000 until the job was done. The parties then agreed to meet the next day to exchange the money.

{¶ 25} On August 18, 2004, Heath, with Hefflin, again met with the "hit man." At this meeting the discussion included the possibility of making the "hit" look like a suicide. Heath indicated that the insurance policy would cover a suicide.

---

7. We are unaware of the specific medium used to make the original recordings of these meetings. The record makes reference at different locations to both videocassette and DVD. Since only a transcript was made part of the court record, we identify both forms of media here.

Heath also discussed a possible second insurance policy, but was unaware if the premium had been paid. Hefflin mentioned that the policies had a double-indemnity clause on accidental death. When asked how she wanted it done, accident versus suicide, Heath indicated, "I really don't want to know." She stated, "I just don't want any of it to come back to me at all, you know what I mean?" She gave the "hit man" $12,000 in cash, which was counted out in her presence. The "hit man" kept $6,000 and gave Hefflin the remaining $6,000 to hold until the job was done. When asked if she was prepared to play the role of the grieving widow, Heath responded, "Yes." At no point in the transcript of the August 18, 2004 meeting did Heath relate to either Hefflin or the "hit man" that she was in imminent fear of her husband or claim that her husband was about to cause her children any harm.

{¶ 26} Following this second conversation, Heath was arrested and charged with the previously outlined offenses. On April 21, 2005, she pleaded guilty to both offenses. Prior to her plea, Heath's lawyer contacted Dr. Robert G. Kaplan, a clinical psychologist, and hired him to complete a psychological report on Heath. This report was dated April 18, 2005, three days prior to the plea.[8]

{¶ 27} The trial court sentenced Heath on two first-degree felony offenses. R.C. 2929.13(D) creates a presumption of imprisonment for first-degree felonies. The presumption can be overcome, and community-control sanctions imposed, only when the trial court finds that a nonprison sanction (1) would adequately punish the offender and protect the public from future crime and (2) would not demean the seriousness of the offense. R.C. 2929.13(D). Without both findings, supported by sufficient reasons, the court must impose a prison term.

{¶ 28} We now turn our attention to the record to determine if the findings made by the trial court satisfy the legal requirements under R.C. 2929.13(D) to overcome the presumption of incarceration as raised in the state's second assignment of error. We review the trial court's findings pursuant to R.C.

---

8. {¶ a} Dr. Kaplan completed a 28–page report on Heath's background, her involvement in the crime, her mental state, and her prognosis. The prosecution stipulated to Dr. Kaplan's credentials, but took issue with the fact that Kaplan failed to interview the husband/victim or the couple's two children. Further, the prosecution appeared to question the validity of the report since it was largely based, in the prosecution's view, on Heath's self-serving statements to Kaplan.

{¶ b} There are references in Dr. Kaplan's report to psychiatric evaluations or treatments completed or conducted in the county jail involving Heath prior to her plea, but these are not part of the record before us for review. There is nothing in the record that indicates that the court or the prosecutor sought an independent psychiatric evaluation, or that any party sought an evaluation by the court psychiatric clinic either prior to or following the plea, to supplement or rebut Dr. Kaplan's findings. Further, other than Dr. Kaplan's analysis initiated by the defense, there is no indication that Heath was independently evaluated for sanity at the time of the act or for her competency to stand trial.

2953.08(G)(2). Under R.C. 2953.08(G)(2), an appellate court may increase, reduce or otherwise modify a sentence, or may vacate the sentence and remand the matter for resentencing, if it clearly and convincingly finds either that the record does not support the sentencing court's findings under R.C. 2929.13(D) or that the sentence is otherwise contrary to law.

{¶ 29} Specifically, R.C. 2929.13(D) requires two findings outlined under R.C. 2929(D)(1) and (D)(2) that must both be made to overcome the presumption of incarceration. R.C. 2929.13(D)(1) has two components. First, it requires the court to find that the community-control sanction or sanctions would "adequately punish the offender." With respect to this requirement, there is no definition or standard outlining specifically what the phrase "adequately punish the offender" means. While many have evaluated this phrase in the context of "protecting the public" and "recidivism" under the second portion of R.C. 2929.13(D)(1), punishment, compared to "protecting the public" or "recidivism," is a distinct and separate concept.[9]

{¶ 30} The second portion of R.C. 2929.13(D)(1) requires the court to find that the community-control sanction or sanctions would "protect the public from future crime." In this instance, the statute directs us to look to the so-called "recidivism factors" under R.C. 2929.12. The recidivism factors referred to in R.C. 2929.13(D)(1) are outlined in R.C. 2929.12(D) and (E).

{¶ 31} R.C. 2929.12(D) and (E) read as follows:

(D) The sentencing court shall consider all of the following that apply regarding the offender, and any other relevant factors, as factors indicating that the offender is likely to commit future crimes:

(1) At the time of committing the offense, the offender was under release from confinement before trial or sentencing, under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or under post-release control pursuant to section 2967.28 or any other provision of the Revised Code for an earlier offense or had been unfavorably terminated from post-release control for a prior offense pursuant to division (B) of section 2967.16 or section 2929.141 [2929.14.1] of the Revised Code.

---

9. Although punishment is a means of achieving public protection, R.C. 2929.11(A) also identifies punishment as an independent goal. No sentence is satisfactory if it is not perceived by the offender and the public as punishment—or, in Judge Mattina's words, "if there is a dramatic departure from the philosophy of rewarding one for good deeds, punishing for bad deeds." Griffin & Katz, Ohio Felony Sentencing Law (2005) 583, Section 5:4. "At its best, in civilized and democratic countries, punishment surely expresses the community's strong disapproval of what the criminal did. Indeed, it can be said that punishment expresses the judgment (as distinct from any emotion) of the community that what the criminal did was wrong." William DeFord, The Dilemma of Expressive Punishment (2005), 76 U.Colo.L.Rev. 843.

(2) The offender previously was adjudicated a delinquent child pursuant to Chapter 2151. of the Revised Code prior to January 1, 2002, or pursuant to Chapter 2152. of the Revised Code, or the offender has a history of criminal convictions.

(3) The offender has not been rehabilitated to a satisfactory degree after previously being adjudicated a delinquent child pursuant to Chapter 2151. of the Revised Code prior to January 1, 2002, or pursuant to Chapter 2152. of the Revised Code, or the offender has not responded favorably to sanctions previously imposed for criminal convictions.

(4) The offender has demonstrated a pattern of drug or alcohol abuse that is related to the offense, and the offender refuses to acknowledge that the offender has demonstrated that pattern, or the offender refuses treatment for the drug or alcohol abuse.

(5) The offender shows no genuine remorse for the offense.

(E) The sentencing court shall consider all of the following that apply regarding the offender, and any other relevant factors, as factors indicating that the offender is not likely to commit future crimes:

(1) Prior to committing the offense, the offender had not been adjudicated a delinquent child.

(2) Prior to committing the offense, the offender had not been convicted of or pleaded guilty to a criminal offense.

(3) Prior to committing the offense, the offender had led a law-abiding life for a significant number of years.

(4) The offense was committed under circumstances not likely to recur.

(5) The offender shows genuine remorse for the offense.

{¶ 32} In applying these statutory considerations at resentencing, the trial court, in finding community-control sanctions appropriate, indicated, "All of the factors indicating an unlikelihood of recidivism apply." The prosecutor, in opposing community-control sanctions at the original sentencing, conceded the point, noting, "I'll grant you that she is not likely to try to kill him again."

{¶ 33} We note that "murder for hire" is a very unusual and rare criminal offense that does not fit neatly into the structure of the Senate Bill 2 sentencing format. 146 Ohio Laws, Part IV, 7136. This offense is often viewed as a "one time" crime. There is often an absence of past criminal activity, which suggests a low risk of recidivism.[10] The only arguable point in either R.C. 2929.12(D) or (E)

---

10. Nevertheless, it is important to note that Dr. Kaplan's findings indicate "an impairment of rational thinking" and an "inability to resist manipulation." Such findings do not preclude the possibility of recidivism.

in this case is whether Heath is truly remorseful. The prosecutor argued, "Why do you think she pled guilty? Because the videotape showed everything." Nevertheless, there is nothing to demonstrate she is not truly remorseful, albeit her remorse comes after being arrested.

{¶ 34} The trial court's reasons and findings with respect to protecting the public and the recidivism factors are supported by clear and convincing evidence in the record. Thus, we agree that the record supports the trial court's findings that the recidivism factors under R.C. 2929.12(D) and (E) support the imposition of community-control sanctions. In doing so, we leave unanswered the question of what punishment is necessary to "adequately punish the offender," as Senate Bill 2 has left no means of evaluating what this term means in the context of punishment.[11]

{¶ 35} The second required finding to overcome the presumption of incarceration is outlined in R.C. 2929.13(D)(2). Here, the court must find that the community-control sanction or sanctions would "not demean the seriousness of the offense." In this instance, the statute directs us to look at the so-called "seriousness factors" under R.C. 2929.12. The "seriousness factors" are outlined in R.C. 2929.12(B) and (C). These will be analyzed separately.

{¶ 36} R.C. 2929.12(B) reads as follows:

(B) The sentencing court shall consider all of the following that apply regarding the offender, the offense, or the victim, and any other relevant factors, as indicating that the offender's conduct is more serious than conduct normally constituting the offense:

(1) The physical or mental injury suffered by the victim of the offense due to the conduct of the offender was exacerbated because of the physical or mental condition or age of the victim.

(2) The victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense.

(3) The offender held a public office or position of trust in the community, and the offense related to that office or position.

(4) The offender's occupation, elected office, or profession obliged the offender to prevent the offense or bring others committing it to justice.

(5) The offender's professional reputation or occupation, elected office, or profession was used to facilitate the offense or is likely to influence the future conduct of others.

(6) The offender's relationship with the victim facilitated the offense.

---

11. Heath did spend approximately 126 days in the county jail during the pendency of this case; however, there is no reference to this fact in the trial court's analysis.

(7) The offender committed the offense for hire or as a part of an organized criminal activity.

(8) In committing the offense, the offender was motivated by prejudice based on race, ethnic background, gender, sexual orientation, or religion.

(9) If the offense is a violation of section 2919.25 or a violation of section 2903.11, 2903.12, or 2903.13 of the Revised Code involving a person who was a family or household member at the time of the violation, the offender committed the offense in the vicinity of one or more children who are not victims of the offense, and the offender or the victim of the offense is a parent, guardian, custodian, or person in loco parentis of one or more of those children.

{¶ 37} In applying the statutory factors outlined under R.C. 2929.12(B), the trial court concluded that only subsections 6 and 7 were applicable. The court stated: "This court concludes factors 1, 2, 3, 4, 5, 8 and 9 are wholly inapplicable."

{¶ 38} We initially note that subsections 3, 4, 5, and 8 are not even remotely related to a murder-for-hire scheme involving a husband and wife. Further, subsection 9, as drafted, appears to have overlooked the murder-for-hire scheme involving a husband and wife, while referring to domestic violence and related offenses of violence against family members. We agree with the trial court that the prosecutor failed to offer any evidence under the first two subsections; yet despite this fact, weighing these subsections in Heath's favor does not outweigh the factors in subsections 6 and 7, which lean in favor of the presumption of incarceration. At best, R.C. 2929.12(B) is evenly balanced for both positions.

{¶ 39} Nevertheless, our focus, and the reason for our reversal, is not based on R.C. 2929.12(B); rather, it is based on the factors outlined under R.C. 2929.12(C).

{¶ 40} R.C. 2929.12(C) reads as follows:

(C) The sentencing court shall consider all of the following that apply regarding the offender, the offense, or the victim, and any other relevant factors, as indicating that the offender's conduct is less serious than conduct normally constituting the offense:

(1) The victim induced or facilitated the offense.

(2) In committing the offense, the offender acted under strong provocation.

(3) In committing the offense, the offender did not cause or expect to cause physical harm to any person or property.

(4) There are substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense.

{¶ 41} With respect to this section, the trial court found that "factors 1, 2 and 4 render Ms. Heath's conduct less serious as supported by the findings of Dr. Robert Kaplan."

{¶ 42} We respectfully disagree and find that the trial court's findings and reasons for imposing community-control sanctions under this section are not supported by the existing evidence in the record. For the reasons outlined below, and pursuant to R.C. 2953.08(G)(2)(a), we vacate the sentence and remand the cause for resentencing because the sentence is contrary to law. The record does not clearly and convincingly support the imposition of community-control sanctions in place of incarceration.

{¶ 43} Our analysis here is focused on R.C. 2929.13(D)(2). The record, as a whole, does not support the findings of the trial court. While we have accepted the trial court's findings that the unusual circumstances in this case are not likely to reoccur and the public is likely protected from future crime, we find that the imposition of community-control sanctions, based on this record, demeans the seriousness of these offenses.

{¶ 44} The record outlining the relationship between Heath and Joseph Heath, as well as Heath's mental state, was largely comprised of a 28–page psychological report prepared by Dr. Robert G. Kaplan, who was hired by the defense to assess her background and mental state.

{¶ 45} Dr. Kaplan found that Heath had severe mental disorders that "impaired her ability to think rationally and resist the manipulation by a confidential informant." Dr. Kaplan found that Heath suffered from posttraumatic stress disorder, major depressive disorder, dysthymic disorder, depersonalization disorder, and dependent-personality disorder. None of these findings negated the mens rea for the crimes. Although these findings may well mitigate the penalty, they do not automatically negate the presumption of incarceration.

{¶ 46} The prosecutor took issue with Kaplan's report, because Dr. Kaplan failed to talk to the husband or the children in reaching his conclusions. Further, the prosecutor characterizes the report as being based on Heath's "self-serving" statements.

{¶ 47} Nevertheless, there is no evidence before this court to refute the diagnosis of Heath's mental state by Dr. Kaplan. That, however, does not end our inquiry. The legal issue is not whether Dr. Kaplan's diagnosis is proper. The issue is whether the record as a whole supports the findings and negates the presumption of incarceration required by the statutes under which Heath was convicted. While Dr. Kaplan's diagnosis is helpful to the analysis, it is in no way controlling.

{¶ 48} The trial court expressly stated that its findings were based on the psychological report of Dr. Kaplan. The trial court "overlayed" [sic] Dr. Kaplan's conclusions about Heath's mental conditions onto the required statutory findings. Contrary to statute, the trial court essentially made Dr. Kaplan's report, rather

than the full record, the arbitrary determiner of what constituted an appropriate sentence. The psychological findings and the statutory findings are not synonymous. As indicated, the psychological report is one tool in the analysis, but it is not controlling.

{¶ 49} We find that the record, albeit incomplete, does not support these findings. Again, we note the trial court's exclusive reliance on Dr. Kaplan's psychological findings to the exclusion of all other evidence in the record.

{¶ 50} First, there is no evidence that Joseph Heath induced or facilitated this offense. Even if we were to adopt the view that Joseph Heath harassed his estranged wife, a view not fully supported by the existing record, we would have to find that Heath's actions of hiring someone to have him killed were then somehow justifiable as to negate the presumption of incarceration for the offense.

{¶ 51} Second, there is no independent evidence that Heath was strongly provoked by anyone. She had just returned from a one-week vacation in Montana with a friend, who later indicated that "[Heath] did not seem upset and did not have difficulty concentrating" during the trip. Joseph Heath was out of the marital home and had been for some time. While it is clear that the couple was going through a heated divorce, there is no independent confirmation of or support for Heath's claims that her husband was out to hurt her or the children. If anything, the statements of the children and the absence of any domestic-violence charges involving Joseph Heath suggest otherwise.[12]

{¶ 52} Third, a murder-for-hire scheme, by its very nature, assumes harm or death will come to the victim. We note that a successful murder-for-hire scheme would be a death-penalty-eligible offense. It is a premeditated, planned, organized criminal act. Here, the effort failed, not because of reluctance or abandonment of the plan, but because of who was selected to complete the crime. Fourth, the record here does not offer substantial grounds to mitigate the offender's conduct to the point of overcoming the presumption of incarceration. While the grounds offered by Dr. Kaplan, if believed, may mitigate the punishment for the offense to a lesser level, they do not, under this record, negate the presumption of incarceration. Dr. Kaplan's report suggests a defense to the crime, albeit not a legally recognized one, in addition to the mitigating factors it offers. While there is no evidence before us indicating Heath was evaluated for sanity at the time of the act, the finding by Dr. Kaplan that Heath had "severe

---

12. As previously noted, Heath did file for and obtain a restraining order against Joseph Heath in August 2003. This resulted in his vacating the marital residence. Heath claims her husband violated the order after it was issued, and we presume her claims are valid. Nevertheless, there is no evidence that he was ever charged with domestic violence or any related crime, even when the police were called to the family home on multiple occasions.

mental disorders that impaired her ability to think rationally," while certainly mitigating the penalty, does not negate the presumption of incarceration.

{¶ 53} Most significantly, the psychological report and findings of Dr. Kaplan do not explain Heath's interest in the proceeds of at least one, and possibly two, insurance policies on her husband's life. This interest undermines her claimed fears about her husband and the finding by Dr. Kaplan that she was unable to control her behavior. If anything, Heath's interest and focus on financial matters, readily ascertainable from a review of the record, raise the specter of other factors at play, namely financial, in addition to the psychological factors outlined in Kaplan's report. Whatever her mental difficulties, the record reflects that she left the second meeting with the "hit man" believing her husband would be dead and she would receive not only the insurance proceeds but the house and business as well.

{¶ 54} Equally important, but apparently not given weight by the trial court or Dr. Kaplan, were the statements of the Heaths' teenage children. They offer a different picture of Joseph Heath's conduct and Heath's claimed fears. Both daughters told investigators they never saw their father hit or threaten their mother. The daughters indicated it was their mother who was often the instigator in these conflicts. Further, the daughters related that it was their mother's boyfriend who was physically abusing their mother at the time of the crime, not their father.

{¶ 55} This court has previously vacated sentences and remanded for resentencing cases in which the trial court's findings supporting the sentence were not supported by the record. *State v. Washatka,* Cuyahoga App. No. 83679, 2004-Ohio-5384, 2004 WL 2252048.

{¶ 56} In this case, Heath's legal counsel did an exemplary job in bringing her psychological factors to light. That said, we see no problem with a trial court, in the absence of evidence to the contrary, giving some deference to Dr. Kaplan's findings in determining the sentence to be imposed. While we vacate the trial court's decision, it appears that the trial court was attempting to act in the best interests of Heath based on Dr. Kaplan's assessment. Nevertheless, a community-control sentence would demean the seriousness of the offense in this case, and the record lacks clear and convincing evidence to overcome the presumption for prison.

{¶ 57} We realize that these events are now more than two years in the past. Arguably, for both sides, justice delayed has been justice denied. We take no solace in reversing this case. We believe the trial court acted with a sound purpose, although we find the statutory factors were not satisfied. We can see that a minimum term, coupled with judicial release, arguably might be appropriate to satisfy the requirements that the offender be punished and the seriousness

of the offense not be demeaned. The community-control sanctions imposed here, however, are simply not supported by the record as a whole as it is presently constituted. Even accepting Heath's assertions that her husband harassed, verbally abused, and threatened her, we are still hard-pressed to see how her response, namely, hiring and paying someone to kill him, is proportionate.

{¶ 58} In searching the admittedly limited number of reported decisions on this topic, we are unable to find any similarly situated offenders who received a like punishment. For these reasons, we vacate the sentence imposed and remand the matter to the lower court for resentencing.

Sentence vacated<br>and cause remanded for resentencing.

ROCCO, J., concurs.

COONEY, P.J., dissents.

COLLEEN CONWAY COONEY, Presiding Judge, dissenting.

{¶ 59} I respectfully dissent.

{¶ 60} First, I must agree with the majority that " 'murder for hire' is a very unusual and rare criminal offense." Majority opinion at ¶ 33. That having been said, I find numerous mandatory penalties for crimes throughout the Ohio Revised Code. If the General Assembly intended mandatory prison time for this rare and serious offense, it should have so provided. Rather than requiring prison time, the General Assembly granted courts discretion in sentencing. And R.C. 2953.08(G)(2) specifically provides that the appellate court's standard for review is not whether the sentencing court abused its discretion.[13] We may vacate the sentence if it is contrary to law. *State v. Mathis,* 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 36.

{¶ 61} Although I may dislike the trial court's sentence, I find nothing that renders it contrary to law.

{¶ 62} The overriding purpose of the felony-sentencing statutes is to "protect the public from future crime by the offender and others and to punish the offender." R.C. 2929.11(A). Accordingly, the trial court's sentence should be reasonably calculated to achieve these purposes, mindful of the seriousness of the offender's conduct, its impact upon the victim, and consistent with other sentences imposed for similar conduct. R.C. 2929.11(B). Pursuant to R.C. 2929.12(A), the trial court has discretion in determining "the most effective way

---

13. The state's brief urges us to vacate the sentence because the trial court abused its sentencing discretion.

to comply with the principles and purposes of sentencing set forth in section R.C. 2929.11." We may modify or vacate a sentence on appeal if we clearly and convincingly find that the record does not support the court's findings or that the sentence is contrary to law. See R.C. 2953.08(G)(2).

{¶ 63} The offenses to which Heath pleaded guilty are first-degree felonies for which it is presumed that a prison term is necessary to comply with the purposes and principles of sentencing under R.C. 2929.11. See R.C. 2929.13(D). The presumption of a prison term may be overcome, however, and a trial court may impose community-control sanctions if it makes both of the findings set forth in R.C. 2929.13(D)(1) and (2). The trial court must also state its reasons for making these findings. R.C. 2929.19(B)(2)(b).

{¶ 64} The trial court found that community-control sanctions would adequately punish Heath and protect the public from future crimes. The court considered the recidivism factors contained in R.C. 2929.12(D) and (E) and concluded that it was not likely that Heath would reoffend. In fact, the court found that none of the factors set forth in R.C. 2929.12(D), likelihood of recidivism, applied. Instead, the court found that all the factors of R.C. 2929.12(E), unlikelihood of recidivism, applied. Heath had no prior criminal history—adult or juvenile, the circumstances under which the case arose were not likely to reoccur, and she was genuinely remorseful.

{¶ 65} The trial court also found that community-control sanctions would not demean the seriousness of the offense. The court considered the factors of R.C. 2929.12(B) and (C) and determined that Heath's mental state and manipulation from outside sources, including a "friend," induced her to hire a hit man to kill her husband. Heath believed if she did not go through with it, the hit man would kill her and her family. She had experienced a traumatic childhood and claimed to have been abused by her husband and then by her boyfriend. She suffered from an array of mental disorders. Although the court found that the couple's relationship facilitated the offense and that it was an offense for hire, the other "more serious" factors did not apply and, thus, the less serious factors outweighed the more serious factors.

{¶ 66} Although sentences should adequately punish the offender, the court found that Heath would not receive the necessary psychological counseling in prison. Moreover, at the time of our limited remand, the trial court noted that Heath had not violated any conditions of her community-control sanctions and had made extensive progress in counseling.

{¶ 67} I find that the trial court considered the requisite statutory factors and supported its reasons with evidence in the record. I do not clearly and convincingly find that the record fails to support the court's findings or that the sentence is contrary to law. Therefore, I would affirm.