[Cite as *State v. Sherman*, 2012-Ohio-3958.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 97840

## STATE OF OHIO

PLAINTIFF-APPELLANT

vs.

## DONNA SHERMAN

DEFENDANT-APPELLEE

## JUDGMENT:
### SENTENCE VACATED;
### REMANDED FOR RESENTENCING

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-547960

**BEFORE:** Celebrezze, J., Stewart, P.J., and E. Gallagher, J.

**RELEASED AND JOURNALIZED:** August 30, 2012

**ATTORNEYS FOR APPELLANT**

William D. Mason
Cuyahoga County Prosecutor
BY:    Mary H. McGrath
          Michael E. Jackson
Assistant Prosecuting Attorneys
The Justice Center
1200 Ontario Street
Cleveland, Ohio 44113


**ATTORNEY FOR APPELLEE**

Michael J. Goldberg
The Goldberg Law Firm
323 Lakeside Avenue, West
450 Lakeside Place
Cleveland, Ohio   44113

FRANK D. CELEBREZZE, JR., J.:

**{¶1}** Appellant, the state of Ohio, brings this appeal pursuant to R.C. 2953.08(B)(1), taking issue with the sentence appellee, Donna Sherman, received following a jury trial finding her guilty of engaging in a pattern of corrupt activity ("RICO"), theft, fraud, and tampering with records. She received community-based sanctions even though her convictions included both first- and second-degree felonies. After a thorough review of the record and pertinent law, we reverse the sentence imposed and remand for resentencing.

## I. Factual and Procedural History

**{¶2}** In 2002, Fred Loewinger orchestrated a scheme to commit mortgage fraud on a large scale in and around Cleveland, Ohio. He submitted fraudulent mortgage transactions to Sherman when she was employed by Titles, Etc., a title company owned and operated by Mitchell Petti. Petti and Sherman were complicit in the scheme and knowingly participated in and approved fraudulent transactions. The mortgages were then sold by the bank making the loans, People's Choice Home Loans ("People's Choice"), and securitized.

**{¶3}** Sherman left Titles, Etc., in 2003 and had no further involvement in the scheme until she opened her own title company, Sherman Title Agency, ("STA") in September 2004. She again acted as the escrow officer for these fraudulent transactions

initiated by Loewinger.  Sherman apparently did not receive any remuneration above standard title fees for her complicity.

{¶4} In the unusually thorough indictment, the state describes the fraud involved to include loan application fraud, down payment fraud, "double HUD" fraud, kickback fraud, and money laundering fraud.

{¶5} Under the loan application scheme, Loewinger and others would knowingly submit false loan applications to People's Choice to obtain home loans, and Sherman was complicit in this process.   The down payment scheme involved Loewinger, Sherman, and others making it appear as if buyers had contributed the required down payment to obtain a home mortgage when, in fact, they had not.  Sherman sometimes used Titles, Etc.'s escrow account to fund these down payment requirements and sent falsified bank checks to make it appear as though the mortgagors had provided the funds.   She later continued to do this when she started STA, only using Loewinger's money to fund the down payment amounts rather than her company's escrow accounts.

{¶6} Under the "double HUD" scheme, Sherman would develop two different copies of a federally-mandated closing statement completed for every home mortgage loan, known as a HUD-1 statement.  One HUD-1 statement showed the actual purchase price of the home, which was shown to the purchaser and seller, while the one submitted to People's Choice had a purchase price inflated to the maximum amount approved by the lender.  The extra loan proceeds were then paid to a company Loewinger owned.   That company then made payments to complicit buyers, sellers, and others involved.

{¶7} Sherman was indicted along with STA on March 9, 2011, on one count of RICO; two counts of theft by deception — one applicable to Sherman involving property valued at $1,455,500 and one applicable to STA involving property valued at $1,166,800;[1] 21 counts of telecommunications fraud; 21 counts of tampering with records; and one count of money laundering.

{¶8} The case proceeded to jury trial on October 18, 2011, and the jury reached its verdict on October 31, 2011. It found Sherman guilty of 12 counts of tampering with records, in violation of R.C. 2913.42(A)(2), involving property valued above $5,000 but below $100,000 (third-degree felonies); nine counts of telecommunications fraud, in violation of R.C. 2913.05, involving property valued above $5,000 but below $100,000 (third-degree felonies); one count of theft by deception, in violation of R.C. 2913.02(A)(3), involving property valued above $750,000 but less than $1,500,000 (a second-degree felony); one count of additional money laundering prohibitions, in violation of R.C. 1315.55 (a third degree felony); and one count of RICO, in violation of R.C. 2923.32 (a first degree-felony).

{¶9} On January 6, 2012, a sentencing hearing was held where Sherman argued that she was not the orchestrator of these crimes and that the state presented no evidence that she received a share in the criminal proceeds above standard industry fees for title work. The state presented sentences received by defendants who committed similar

---

[1] The second count of theft by deception applicable to STA was later dismissed.

crimes, including that of Petti and Loewinger, and the sentence imposed in an unrelated case against Clarissa Foster. Loewinger had received a six-year prison term, and Petti received community-based sanctions, including 20 weekends in the county jail.

{¶10} Foster's convictions were similar to Sherman's, except Foster did not have a RICO conviction. Foster was convicted of second- and third-degree felonies similar to Sherman. Foster received a seven-year prison term for her role in a mortgage fraud scheme where her participation was similar to Sherman's. Foster's background was also similar to Sherman's — being of similar age with no prior convictions. The state used this case to argue that Sherman should receive a prison sentence of at least five years to fall under Loewinger's sentence, but far above that imposed in Petti's case.

{¶11} The trial court took this under advisement and sentenced Sherman to five years of community control as well as six months in the county jail. The court also fined her the maximum amount of $20,000, ordered costs, and ordered her to complete 100 hours of community service during each year of community control. The court also imposed the maximum institutional fine of $25,000 on STA. The state appeals, assigning one error:

> I. The trial court abused its discretion in failing to impose a prison term for appellee's convictions, which carried presumptions in favor of prison terms pursuant to R.C. 2929.13, when the trial court failed to make the required findings and appellee failed to overcome the presumption in favor of prison.

II. Law and Analysis

A. Discretion in Sentencing

i. Standard of Review

**{¶12}** The state begins its brief by setting forth the applicable standard of review, citing to the Ohio Supreme Court's plurality opinion in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124. There, the court set forth the appropriate standard of review for felony sentencing following its opinion in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470, which severed judicial fact-finding requirements of S.B. 2. That decision left trial courts with a wide berth in crafting sentences as long as they were within the statutory guidelines. According to *Kalish*, a reviewing court engages in a two-step process where it should first examine the sentence to see if it is clearly contrary to law and, if not, go on to determine whether the sentence constitutes an abuse of the trial court's discretion. *Id.* at ¶ 4.

**{¶13}** It is questionable whether this framework is applicable to the present case. The Ohio Supreme Court recognized that *Foster* left unchanged R.C. 2953.08 as it relates to the state's appeal from a downward departure from a presumption of prison for a felony of the first or second degree. *State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1, ¶ 23. R.C. 2953.08(G)(2) explicitly sets forth the applicable standard of review:

> The court hearing an appeal [from, among other things, the state challenging a downward departure pursuant to R.C. 2929.13(D)(2)] * * * shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
>
> * * * The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division * * * (D) of section 2929.13, * * *;

(b) That the sentence is otherwise contrary to law.

**{¶14}** Further, even if *Mathis* had not offered guidance on this issue, this section has been revived by Am.Sub.H.B. 86 ("H.B. 86"), effective September 30, 2011. This provision is substantially similar to the same section enacted under S.B. 2 in 1996. Case law dealing with review of a downward departure from a presumptive felony sentence pre-*Foster* is applicable.

**{¶15}** This court has previously found the "statute's requirement of a 'clear and convincing' finding of error below to be consonant with the presumption of regularity which adheres to all judicial proceedings." *State v. Assad,* 8th Dist. Nos. 72648 and 72649, 1998 WL 308109, *4 (June 11, 1998), citing *Coleman v. McGettrick*, 2 Ohio St.2d 177, 180, 207 N.E.2d 552 (1965).

**{¶16}** The *Assad* court went on to note:

In order for this court to modify or vacate the lower court's sentence under R.C. 2953.08(G)(1)(c), we must clearly and convincingly find either that the court did not follow the procedures set forth in 2929.13(D) or that those procedures were followed but that there was an insufficient basis for overriding the presumption in favor of a prison term.

*Id*. at *6. Therefore, we presume the sentence imposed by the trial court is correct absent evidence that it is clearly and convincingly contrary to law. "Clear and convincing evidence is more than a mere preponderance of the evidence; it is that evidence 'which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *State v. Edwards,* 8th Dist. No. 82327, 2003-Ohio-5503, ¶

32, quoting *State v. Garcia*, 126 Ohio App.3d 485, 710 N.E.2d 783 (12th Dist.1998),

citing *Cincinnati Bar Assn. v. Massengale*, 58 Ohio St.3d 121, 122, 568 N.E.2d 1222

(1991).

ii. Community Sanctions in Lieu of Prison

{¶17} First- and second-degree felony convictions carry with them a presumption

in favor of prison. R.C. 2929.13(D)(1) states, "for a felony of the first or second degree,

* * * it is presumed that a prison term is necessary in order to comply with the purposes

and principles of sentencing under section 2929.11 of the Revised Code." However, in

certain situations, a trial court may depart from that presumption. R.C. 2929.13(D)(2)

outlines those situations and offers guidance to the sentencing court:

> [T]he sentencing court may impose a community control sanction or a combination of community control sanctions instead of a prison term on an offender for a felony of the first or second degree * * * for which a presumption in favor of a prison term is specified as being applicable if it makes both of the following findings:
>
> (a) A community control sanction or a combination of community control sanctions would adequately punish the offender and protect the public from future crime, *because the applicable factors under section 2929.12 of the Revised Code indicating a lesser likelihood of recidivism outweigh the applicable factors under that section indicating a greater likelihood of recidivism.*
>
> (b) A community control sanction or a combination of community control sanctions would not demean the seriousness of the offense, *because one or more factors under section 2929.12 of the Revised Code that indicate that the offender's conduct was less serious than conduct normally constituting the offense are applicable, and they outweigh the applicable factors under that section that indicate that the offender's conduct was more serious than conduct normally constituting the offense.*

(Emphasis added.)

**{¶18}** Sherman is eligible for community control in lieu of prison. R.C. 2929.13(D) provides a list of offenses where a downward departure from the presumption of prison is inapplicable. A RICO conviction is included in that list, but only when the offense or offenses constituting the basis of the corrupt activity charge include a first-degree felony. R.C. 2929.13(F)(10). Here, Sherman's underlying convictions are second- and third-degree felonies. No other provision of R.C. 2929.13 prohibits community sanctions in this case.

**{¶19}** In order to overcome the presumption of prison, the trial court must make two affirmative findings. *State v. Heath*, 170 Ohio App.3d 366, 2007-Ohio-536, 867 N.E.2d 453, ¶ 27 (8th Dist.). It must apply the factors set forth in R.C. 2929.12 and find that community control would adequately punish the offender and protect the public from future offenses, and would not demean the seriousness of the offenses committed. *Id.*; R.C. 2929.13(D)(2).

**{¶20}** Here, the trial court addressed the required findings needed to overcome the presumption of prison. The court, during sentencing, stated:

> [R.C.] 2929.13 offers guidance by degree of felony for courts. There's a presumption, of course, of prison for counts 1 and 2 of this indictment. The other counts do not have a presumption of prison.

> I am not going to impose a prison sentence. I find that pursuant to [R.C.] 2929.13(D)(2), that community control, instead of a prison sentence, would adequately punish Ms. Sherman and protect the public. A properly fashioned community control sanction does not demean the seriousness of this [sic] offenses. Ms. Sherman's conduct here was serious, but she was not the orchestrator of the scheme.

**{¶21}** R.C. 2929.11 lists the overriding purposes of felony sentencing to be "to protect the public from future crime by the offender and others and to punish the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources."

**{¶22}** R.C. 2929.12 then sets forth non-exhaustive factors the court should consider. In determining the seriousness of the offense, R.C. 2929.12(B) instructs the court to examine the following factors applicable to this case:

(1) The physical or mental injury suffered by the victim of the offense due to the conduct of the offender was exacerbated because of the physical or mental condition or age of the victim.

(2) The victim of the offense suffered serious physical, psychological, or economic harm as a result of the offense.

(3) The offender held a public office or position of trust in the community, and the offense related to that office or position.

(4) The offender's occupation, elected office, or profession obliged the offender to prevent the offense or bring others committing it to justice.

(5) The offender's professional reputation or occupation, elected office, or profession was used to facilitate the offense or is likely to influence the future conduct of others.

(6) The offender's relationship with the victim facilitated the offense.

(7) The offender committed the offense for hire or as a part of an organized criminal activity.

**{¶23}** And in mitigation, R.C. 2929.12(C) directs the court to consider:

(1) The victim induced or facilitated the offense.

* * *

(3) In committing the offense, the offender did not cause or expect to cause physical harm to any person or property.

(4) There are substantial grounds to mitigate the offender's conduct, although the grounds are not enough to constitute a defense.

**{¶24}** In determining whether a defendant is likely to commit future crimes, as it relates to this case, R.C. 2929.12(D) directs the trial court to consider:

* * *

(4) The offender has demonstrated a pattern of drug or alcohol abuse that is related to the offense, and the offender refuses to acknowledge that the offender has demonstrated that pattern, or the offender refuses treatment for the drug or alcohol abuse.

(5) The offender shows no genuine remorse for the offense.

**{¶25}** And in mitigation, R.C. 2929.12(E) directs the court to consider:

(1) Prior to committing the offense, the offender had not been adjudicated a delinquent child.

(2) Prior to committing the offense, the offender had not been convicted of or pleaded guilty to a criminal offense.

(3) Prior to committing the offense, the offender had led a law-abiding life for a significant number of years.

(4) The offense was committed under circumstances not likely to recur.

(5) The offender shows genuine remorse for the offense.

**{¶26}** The trial court's terse statement regarding the downward departure leaves much to be desired. It did not address a single factor contained within R.C. 2929.12.

**{¶27}** However, the trial court is not required to state on the record the reasons supporting its findings to depart from the presumption of prison. With H.B. 86, the

legislature amended R.C. 2929.19 to delete sections requiring the trial court to give reasons when departing from the presumption of prison. R.C. 2929.19(B)(2) previously stated:

> [T]he court shall impose a sentence and shall make a finding that gives its reasons for selecting the sentence imposed in any of the following circumstances:
>
> * * *
>
> (b) If it does not impose a prison term for a felony of the first or second degree * * *, its reasons for not imposing the prison term and for overriding the presumption, based upon the overriding purposes and principles of felony sentencing set forth in section 2929.11 of the Revised Code, and the basis of the findings it made under divisions (D)(1) and (2) of section 2929.13 of the Revised Code.

**{¶28}** The removal of this provision means the court must make the required findings under R.C. 2929.13(D)(2), but does not need to give reasons supporting those findings. But, the court must at least indicate that it applied the factors in R.C. 2929.12, as required by R.C. 2929.13(D)(2). Here, the trial court did not do that.

**{¶29}** However, the record here does not clearly and convincingly show that the findings the trial court made are unsupported. At sentencing, Sherman argued that she was not the mastermind of this scheme and did not share in the illicit proceeds of the enterprise. She received only the standard fees associated with title work in the industry. Also, she had no prior criminal convictions or juvenile adjudications. She cooperated with local and federal investigators, giving honest and forthright interviews with authorities. She showed remorse, although she failed to acknowledge or address a positive drug test for marijuana. Her license to conduct business as a title agent issued

by the state of Ohio was terminated. This, she argued, meant that she was no longer in a position to engage in the kind of activity that lead to her convictions. Sherman also addressed the harm to the victim. She argued during sentencing that no harm occurred to People's Choice because it was an internet bank set up to engage in these kinds of transactions, was complicit in the scheme, and suffered no damages in making questionable loans because it immediately packaged and sold those loans to others.

{¶30} This court has previously upheld a community-based sentence in a second-degree felony case where the trial court made conclusory statements about the presumption in favor of prison and found that the appellee had overcome that presumption. *State v. Scovil*, 127 Ohio App.3d 505, 713 N.E.2d 452 (8th Dist.1998). In fact, the trial court addressed these factors and the presumption in the journal entry with only a single statement that the required findings were made. *Id*. at 510.

{¶31} In the present case, the record does not clearly and convincingly demonstrate that the trial court's findings that community control would adequately punish Sherman and that such a sentence does not demean the seriousness of the offense were incorrect.

### iii. Sentencing Disparity

{¶32} The state also presented evidence that a similarly situated criminal defendant, Foster, received a seven-year prison sentence. R.C. 2929.11(B) directs that the trial court impose a sentence "consistent with sentences imposed for similar crimes committed by similar offenders." However, sentencing in Ohio is not accomplished

according to a tightly controlled grid system similar to federal sentencing guidelines. *State v. Dawson*, 8th Dist. No. 86417, 2006-Ohio-1083, ¶ 31.   Rather, an appellate court must examine the record, not to decide whether the trial court "imposed a sentence that is in lockstep with others, but whether the sentence is so unusual as to be outside the mainstream of local judicial practice.   Although the offense[s] may be similar, distinguishing factors may justify dissimilar treatment."   *State v. Hites*, 3d Dist. No. 6-11-07, 2012-Ohio-1892, ¶ 15, quoting *Dawson* at ¶ 31.

**{¶33}** The state offered evidence of the sentence imposed in Foster's case, a purportedly analogous situation, and discounted the sentence imposed in codefendant Petti's case because Petti was convicted of participating in the loan origination process for three homes (with a total value of approximately $200,000), not 21 homes (with a total estimated value of $1,400,000) like Sherman.

**{¶34}** This court recently rejected an argument similar to the state's that was raised by an individual who received a ten-year prison sentence after being convicted of various child pornography offenses.   *State v. Stein*, 8th Dist. No. 97395, 2012-Ohio-2502. There, Stein's attorney offered comparisons to 70 people convicted in similar cases and the resulting sentences.   *Id*. at ¶ 24-25.   This court rejected the argument based on the lack of comparative characteristics included in the documentation provided by Stein. Stein offered only the journal entries setting forth the sentences in those other cases, not background information.

**{¶35}** Here, we have more detailed information about Foster and how her background, criminal activity, and culpability mirror Sherman's. Based on the state's argument, the cases are so similar that the trial court should have addressed them when meting out a sentence so disproportionate to that imposed in Foster's case.

**{¶36}** While every case is different, and consistent sentences can usually be achieved from the proper application of R.C. 2929.12 and the purposes and principles of sentencing, the trial court's application of those factors to this criminal defendant is lacking in the record. In fact, the trial court stated it was "mindful of the requirements of [R.C.] 2929.11(A)[,]" but never mentioned the proportionality requirement of R.C. 2929.11(B). The journal entry in this case merely states that the "Court considered all required factors of the law." The state raised the proportionality issue during the sentencing hearing and presented specific cases for comparison. Although no specific findings need to be made regarding proportionality, *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, 951 N.E.2d 381, ¶ 31, the trial court failed to address this issue at all.

**{¶37}** In an analogous situation, this court reversed the sentence. *State v. Lyons*, 8th Dist. No. 80220, 2002-Ohio-3424, ¶ 30-34. This case has been limited and criticized due to the lack of a meaningful way for a trial court to compare sentences, but that problem does not present itself here. The parties supplied that information to the trial court. Further, some cases limiting *Lyons* relied on the trial court's statement that it specifically considered proportionality in crafting its sentence. *E.g.*, *State v. Medina*, 8th Dist. No. 83261, 2004-Ohio-2863, ¶ 23. Here, we do not have such a statement.

**{¶38}** This court has nothing to rely on but a large sentencing disparity between apparently similarly situated defendants in the record before it. Left with this, the sentence must be reversed. This court is also not in a position to amend the sentence where the record before us does not include a trial transcript and other pertinent information that the trial court would use to craft a sentence. Therefore, we must remand the case to the trial court for resentencing.

## III.   Conclusion

**{¶39}** The trial court's finding that Sherman had overcome the presumption of prison is not clearly erroneous, but the court failed to offer any proportionality analysis when the argument was properly presented. Had the court set forth specific findings for its departure from the presumption of prison, the consistency argument may have been resolved. However, its failure to do so and the large discrepancy in sentences between similarly situated defendants requires this court to vacate Sherman's sentence and remand for resentencing.

**{¶40}** The sentence of the trial court is vacated, and this cause is remanded to the lower court for resentencing in accordance with law and this decision.

It is ordered that appellant recover of said appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

FRANK D. CELEBREZZE, JR., JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
MELODY J. STEWART, P.J., CONCURS (WITH SEPARATE OPINION ATTACHED)


MELODY J. STEWART, P.J., CONCURRING:

{¶41} I concur in the decision reached in this case, but I would be remiss if I did not take this opportunity to call attention to the role that implicit associations might play in sentencing disparities like the one demonstrated in this case.

{¶42} A trial court has many factors to consider and an array of concerns to address when sentencing a criminal defendant. One of those concerns is that a sentence be imposed in conformity with the overriding purposes of felony sentencing. *See* R.C. 2929.11.

{¶43} A requirement of R.C. 2929.11(B) is that a sentence be imposed "consistent with sentences imposed for similar crimes committed by similar offenders." This is not to say that a trial court must sentence an offender identically to one who is similarly situated. However, as noted in *State v. Moore*, 8th Dist. No. 85451, 2005-Ohio-4699, "it is the trial court's responsibility to insure consistency among the sentences it imposes." *Id.* at ¶ 26, citing *State v. Lyons*, 8th Dist. No. 80220, 2002-Ohio-3424, and *State v. Stern*, 137 Ohio App.3d 110, 738 N.E.2d 76 (1st Dist.2000) (McMonagle, J., concurring in part, dissenting in part). As the majority opinion makes clear, there is no indication in the record that the trial court considered this proportionality requirement. The trial court's

failure to do so leads one to ask:   why such a disparity between the sentences of Sherman and Foster?

**{¶44}** One of the purposes of having sentencing guidelines is to help reduce excessive disparities in sentencing while maintaining the trial court's flexibility to impose a sentence based on the individual circumstances of each case.   But sentencing is a multifaceted process and disparities can arise for a variety of reasons.   First and foremost, the trial court has wide discretion when imposing a sentence.   The court is required to consider the purposes of sentencing and the factors set forth in R.C. 2929.11 and 2929.12, impose a sentence permitted within the guidelines, and comply with any other statutory requirements.   Additionally, there are other case factors that impact the trial court's sentencing decision, like the nature of a plea entered to charges, whether there is a recommended sentence proposed to the court, and the effectiveness of counsel. As a practical matter, the court is comprised of many judges with different backgrounds, temperaments, and judicial philosophies.   In the court of common pleas, there are over 240 judges throughout the state who preside over criminal cases:   34 of those judges sit in Cuyahoga County.   On any given day, similarly situated defendants convicted of the same or similar crimes can have sentences imposed, the sanctions of which differ significantly.   Notwithstanding the ways in which the above-noted reasons may contribute to sentence disparities, it is important to understand also how implicit bias contributes to such disparities.

**{¶45}** Implicit bias, unlike intentional bias, is unconscious. It is the product of our upbringing and our environment. Implicit bias is also not to be confused with what is commonly known as judicial bias; the latter being described as "hostile feelings, ill will, or favoritism toward a litigant or his attorney, resulting in the formation of an anticipated judgment * * *." *State v. LaMar*, 95 Ohio St.3d 181, 186, 2002-Ohio-2128, 767 N.E.2d 166, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E. 191 (1956), paragraph four of the syllabus. Likewise, a sentence influenced by implicit bias is unlike a sentence imposed in contravention of R.C. 2929.11(C) that expressly prohibits a court from imposing a sentence based "upon the race, ethnic background, gender, or religion of the offender." A sentence "based upon" one or more factors necessarily assumes a conscious and deliberate consideration of those factors when meting out punishment for an offender. Implicit bias operates without such awareness.

**{¶46}** Implicit bias has been characterized as:

a psychological process in which a person's non-conscious racial beliefs * * * and attitudes * * * affect her or his behaviors, perceptions and judgments in ways that she or he are largely unaware of and typically, unable to control. These implicit biases can have behavioral effects even when they conflict with an individual's consciously and genuinely held thoughts and feelings. **People of all races** show evidence of implicit bias against nonwhites. (Emphasis added; internal citations omitted.)

Richardson, *Race & Immigration Symposium: Cognitive Bias, Police Character, and the Fourth Amendment*, 44 Ariz. St. L.J. 267, 271-272 (2012). *See also* Greenwald & Hamilton, *Implicit Bias: Scientific Foundations*, 94 Cal. L.Rev. 945 (2006).

Stereotype formation is the foundation of implicit bias. Research on stereotype formation and maintenance confirms that stereotypes are instilled

at an early age and come from cultural and societal beliefs * * *. [P]sychologists have found that stereotypes arise when a person is as young as three years old and are usually learned from parents, peers, and the media. As people grow older, their stereotypes become implicit and remain mostly unchanged even as they develop nonprejudiced explicit views. "Stereotypes about ethnic groups appear as a part of the social heritage of society * * *. [And] no person can grow up in a society without having learned the stereotypes assigned to the major ethnic groups." (Internal citations omitted.)

Levinson, *Forgotten Racial Equality: Implicit Bias Decisionmaking, and Misremembering*, 57 Duke L.J. 345, 363, fn. 22 (2007), quoting Page, *Batson's Blind-Spot: Unconscious Stereotyping and the Peremptory Challenge*, 85 B.U. L.Rev. 155, 203 (2005).

**{¶47}** Various commentators have discussed the impact of implicit bias on our criminal justice system. It often affects who gets prosecuted, what charges are brought, jury selection, effectiveness of counsel, and sentencing. *See, e.g.*, Kang & Lane, *Seeing Through Colorblindness: Implicit Bias and the Law*, 58 UCLA L.Rev. 465 (2010).

**{¶48}** In one study of trial court judges' decision making, the author discussed how implicit bias may operate in sentencing, examining whether unconscious or hidden bias may lead to harsher criminal penalties for certain offenders, despite the judges' professional commitment to sentence proportionality. *See* Rachlinski, et. al, *Does Unconscious Racial Bias Affect Trial Judges*, 84 Notre Dame L.Rev. 1195 (2009). Using mock cases and the Implicit Association Test (IAT) as a measure, the study examined the interaction of the judges' IAT preferences and their judgments in the mock cases, finding that implicit bias did affect their decision making. The study noted also

that, in some instances, when judges were made aware of their preferences and biases, they were able to alter them.

{¶49} In the case at bar, it may very well be that under the circumstances, the trial court would have sentenced Sherman exactly as it did, regardless of her race, ethnicity, gender, or other personal characteristics. And it may be that the court in Foster's case would have imposed the same, more severe sentence, regardless of Foster's race, ethnicity, etc.[2] However, the disparity in sentencing of these individuals who are so similarly situated, save race or ethnicity, at least requires consideration of what impact unconscious preferences or biases may have played in the disparity.

{¶50} Because there is no "cure" for completely ridding ourselves of these hidden influences, an appreciation for their existence and an awareness of how they impact decision making will go a long way in helping to improve our justice system. Continuing education, discussions, and research will aid these endeavors.

---

[2] These statements are made without regard to the ethnicity or gender of the trial court judges in the respective cases. Although studies show that individuals are more prone to make decisions that are preferential when in-group and biased when out-group, everyone's decision making is influenced by implicit associations. Implicit bias is being discussed here as a social justice issue, not an individual one.