[Cite as *State v. J.L.S.*, 2019-Ohio-4173.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio, :

    Plaintiff-Appellee, : No. 18AP-125
(C.P.C. No. 16JU-12031)

v. : (C.P.C. No. 17CR-5107)

[J.L.S., III], : (REGULAR CALENDAR)

    Defendant-Appellant. :

---

D E C I S I O N

Rendered on October 10, 2019

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Steven L. Taylor*, for appellee. **Argued:** *Steven L. Taylor*.

**On brief:** *Stephen E. Palmer*, and *William J. Fornia*, for appellant. **Argued:** *Stephen E. Palmer*.

---

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, J.L.S., III, appeals from judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch ("juvenile court") and the General Division ("trial court") binding him over from the juvenile court to the trial court and sentencing him to a four-year term of incarceration following a plea of no contest. For the following reasons, we reverse.

## I. Facts and Procedural History

{¶ 2} On October 7, 2016, plaintiff-appellee, State of Ohio, filed a complaint in the juvenile court alleging appellant was delinquent and committed the offense of conspiracy to commit murder, in violation of R.C. 2903.02 and 2923.01, a felony of the first degree. In the complaint, the state alleged appellant committed the following substantial overt acts in

furtherance of the conspiracy: (1) "provided a map of the plan to commit murder to John Doe #1," (2) "solicited John Doe #1 to participate in conspiracy to commit murder," (3) "solicited John Doe #2 to participate in the conspiracy to commit murder," and (4) "showed and explained map of the plan to commit murder to John Doe #2." (Compl. at 1.)

{¶ 3} On April 17, 2017, the juvenile court held a hearing at which appellant entered a stipulation to a finding of probable cause. In the recitation of facts at the hearing, the assistant prosecutor asserted that beginning in spring 2016, appellant began soliciting others to assist him in conducting a mass shooting at Hilliard Davidson High School. Appellant engaged in discussions with classmates over a messaging application, with at least one classmate feigning agreement with the plan during the school year.

{¶ 4} In the following school year, beginning after summer 2016, appellant's efforts intensified. Appellant drew at least three diagrams, which included plans of attack on the school. In recruiting others, appellant displayed the diagrams and explained how the shooting would proceed. Appellant regularly discussed his plans with a group of students, including a second student who also feigned agreement with appellant's plans. Although the agreement of the two students was only feigned, appellant believed they had committed in earnest and continued his preparations.

{¶ 5} One of the recovered diagrams, which was admitted as an exhibit at the hearing, displayed the positioning of his co-conspirators during the attack. The diagram also contained a list of ammunition and firearms required for the attack. There were references to school shootings on the diagram, including specific reference to "the Columbine shooters, Dylan Klebold and Eric Harris." (Apr. 17, 2017 Tr. at 9.) At the bottom of the diagram, there was a reference to the "last week of school assembly." (Apr. 17, 2017 Tr. at 9.)

{¶ 6} On September 22, 2016, some students saw appellant showing the diagram to others and reported the incident to the school resource officer from the City of Hilliard Division of Police. Following investigation by law enforcement agencies, a search warrant was issued, resulting in the seizure of a computer, school-issued iPad, and phone from appellant. According to the assistant prosecutor, search history from September 2016 recovered from the devices revealed the following:

> Timothy McVeigh, the Irish Republican Army, Bin Laden and Bin Laden death time, which we believe to be [appellant] searching for a significant date to commit the attack. [Appellant] also searched 500 Smith & Wesson firearms for sale, street sweeper shotgun, which the State believes to be a reference to assault style weapons. He searched for Vance's and LAPD shooting ranges. Many searches for firearms, firearm -- how to purchase firearm parts. He searched the quo -- to quote, one of his search terms was "fully automatic weapons for sale". He -- his [web bookmarks] included easy ways to make thermite. He also bookmarked a number of firearms websites.
>
> In addition to those, the officers found photos and other data that was extremely disturbing including horrific racist images, dozens of pictures of Nazi and Naz -- Neo-Nazi imagery, photos of firearms, photos of firearms that were taken from stores and online ads, a video of the defendant reloading a firearm, images glorifying school shootings and Columbine, images making light of the Holocaust.

(Apr. 17, 2017 Tr. at 10.)

{¶ 7} Additionally, investigators recovered from appellant's phone messages with two to three other students. In those messages, there was "constant discussion about Hitler, the Nazi's, discussion about Mein Kampf, [and] discussion about school shooting." (Apr. 17, 2017 Tr. at 11.) The messages also "contained horrifically racist language, particularly aimed at African American and Jewish people," which, according to the assistant prosecutor, was related to appellant's motivation for the shooting. (Apr. 17, 2017 Tr. at 11.)

{¶ 8} After his arrest, appellant sent a text in which he asked another person to destroy the diagram. Following the execution of a search warrant on appellant's home, the following items were seized by investigators: four gas masks, a tactical vest, shooting targets that had been shot, and firearm advertisements which had been cut from newspapers and magazines. The assistant prosecutor concluded the summary by stating appellant was preparing to "carry out the object of this conspiracy that he believed others had already agreed to, which was to shoot and kill as many people at Hilliard Davidson High School as possible." (Apr. 17, 2017 Tr. at 11-12.)

{¶ 9} On the same day as the hearing, the juvenile court filed a judgment entry reflecting a finding of probable cause based on the stipulation of the parties. On April 26, 2017, the juvenile court filed a judgment entry amending its April 17, 2017 judgment entry.

{¶ 10} On August 30, 2017, the juvenile court conducted an amenability hearing. At the hearing, Dr. Daniel L. Davis, Ph.D., a forensic psychologist, testified as an expert witness in forensic psychology and in the area of juvenile justice. Dr. Davis performed a bindover evaluation on appellant, in which he considered treatment needs, risks, and psychological factors that contribute to amenability. In the course of his evaluation, Dr. Davis reviewed police interviews, police reports, text message correspondence, web search history, school records, medical records from Nationwide Children's Hospital, and mental health records. Dr. Davis consulted with appellant's therapist, Edward Scott Dagenfield, MA, LICDC, and interviewed appellant's family, including his mother, father, and stepfather. Finally, Dr. Davis performed psychological testing on appellant.

{¶ 11} As a result of his evaluation, Dr. Davis found appellant had mental health needs requiring treatment from a person skilled in treating adolescents. Dr. Davis stated that "given the gravity of the accusations against [appellant], that treatment should be carefully monitored and progress or lack of progress should be always made aware to the Court." (Aug. 30, 2017 Tr. at 24.) Dr. Davis rendered the opinion that appellant had a "moderate to high probability of amenability and in all of the factors that I looked at, the arguments from a psychological perspective outweighed those factors that were negative in suggesting that the person be transferred." (Aug. 30, 2017 Tr. at 39.)

{¶ 12} Nicole Bass-Stith, an intensive probation officer with the Franklin County Juvenile Probation Department, testified she began supervising appellant on April 17, 2018. Appellant was on GPS electronic monitoring and was confined to his home unless he had a doctor's appointment, counseling session, or meeting with his attorney. Appellant was enrolled in school at the Electronic Classroom of Tomorrow. Bass-Stith testified she was not aware of any threatening behavior from appellant since she began supervising him. Bass-Stith stated appellant was following her rules.

{¶ 13} When the juvenile judge made reference to "[t]here was something about being described as creepy," Bass-Stith responded "[n]o. What I said was, that I had concerns. I never said -- I don't know if I said those words. I'm pretty sure I didn't say those

words." (Aug. 30, 2017 Tr. at 101-02.) Bass-Stith elaborated that she had "concerns" because appellant was "over accommodating," although she stated that "now that I've gotten to know the family, I'm assuming * * * that's just how they are." (Aug. 30, 2017 Tr. at 102.) Bass-Stith also had initial concerns because of a question appellant asked about how "he couldn't go places and what if the house caught on fire or what if they ran out of gas or what if something happened." (Aug. 30, 2017 Tr. at 102.)

{¶ 14} Lois Thorpe, an employee of the Franklin County Juvenile Probation Department in the Electronic Monitoring Unit, testified she was responsible for monitoring appellant's ankle monitor and visited him once a week at his home. Appellant had no violations on his ankle monitor. Based on her interactions with appellant, Thorpe found him to have a high maturity level. Thorpe testified she never felt threatened at appellant's home, neither appellant nor his family had done anything that would cause her alarm, and she never received any reported concerns from the community about appellant.

{¶ 15} Following testimony, the juvenile court admitted: (1) Dr. Davis's report, (2) a NetCare Forensic Report authored by Jayne Speicher-Bocija, Ph.D., a psychologist with NetCare Forensic Center, (3) records from the Juvenile Detention Center, (4) the bindover investigation packet, and (5) the state's exhibits. In the NetCare report, Dr. Speicher-Bocija found with a reasonable degree of professional certainty that appellant was amenable to care or rehabilitation in the juvenile system.

{¶ 16} On September 6, 2017, the juvenile court held a hearing at which it found appellant was not amenable to treatment in the juvenile system. On the same day, the juvenile court filed findings of fact and conclusions of law ("decision"), reflecting its amenability determination. On September 11, 2017, the juvenile court filed a judgment entry binding appellant over to the trial court.

{¶ 17} On September 28, 2017, a Franklin County Grand Jury filed an indictment charging appellant with the aforementioned offense of conspiracy to commit murder. On January 9, 2018, the trial court held a hearing at which appellant entered a plea of no contest. On the same day, the trial court filed an entry reflecting appellant's plea.

{¶ 18} On February 8, 2018, the trial court held a sentencing hearing. On February 9, 2018, the trial court filed a judgment entry finding appellant guilty of the charged offense, sentencing him to a term of incarceration of four years, and imposing a

mandatory five-year period of postrelease control. On March 9, 2018, the trial court filed an amended judgment entry.

## II. Assignment of Error

{¶ 19} Appellant appeals and assigns the following sole assignment of error for our review:

> THE JUVENILE COURT ABUSED ITS DISCRETION BY DISREGARDING UNREFUTTED EVIDENCE, ENGAGING IN AN ARBITRARY ANALYSIS OF THE FACTS AND LAW, AND GRANTING THE STATE'S MOTION TO TRANSFER APPELLANT'S CASE TO ADULT COURT, IN VIOLATION OF R.C. 2152.12(B) AND DUE PROCESS OF LAW UNDER THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

## III. Discussion

{¶ 20} In his assignment of error, appellant asserts the juvenile court erred in granting the state's motion to transfer appellant's case to the trial court to be tried as an adult.

### A. Standard of Review

{¶ 21} Because "an amenability hearing is a broad assessment of individual circumstances and is inherently individualized and fact-based," we apply an abuse of discretion standard when reviewing a juvenile court's determination regarding amenability to rehabilitation in the juvenile system. *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, ¶ 14. An abuse of discretion connotes a decision that is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

### B. Applicable Law

{¶ 22} R.C. 2152.12 governs the transfer of a juvenile from the juvenile court to the trial court to be tried as an adult. *State v. Easley*, 10th Dist. No. 16AP-9, 2016-Ohio-7271, ¶ 7, citing *State v. Morgan*, 10th Dist. No. 13AP-620, 2014-Ohio-5661, ¶ 30. Pursuant to R.C. 2152.12(B), a juvenile court may transfer the case if it finds that: (1) the child was 14 years of age or older at the time of the offense, (2) there is probable cause to believe the child committed the offense, and (3) the child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require the child be subject to adult sanctions. Because appellant was 16 years old at the time of the offenses, the

juvenile court was required to determine whether there was probable cause to believe the child committed the act alleged.  R.C. 2152.12(B)(2); *Easley* at ¶ 7.  Appellant stipulated as to the existence of probable cause in the juvenile court and does not dispute the existence of probable cause on appeal.

{¶ 23}  As the age and probable cause requirements were met, the juvenile court was required, pursuant to R.C. 2152.12(B)(3), to determine whether appellant was amenable to care or rehabilitation in the juvenile system, considering the factors listed under R.C. 2152.12(D) and (E). "In making this determination, the court is required to consider whether the factors indicating that the case should be transferred outweigh the factors indicating that the case should not be transferred."  *Easley* at ¶ 8, citing *State v. Erwin*, 10th Dist. No. 09AP-918, 2012-Ohio-776, ¶ 8.  Because the statutes are silent regarding the weight accorded to individual factors, the juvenile court "has the discretion to determine how much weight should be accorded to any given factor."  *Id.* at ¶ 8, citing *State v. Marshall*, 1st Dist. No. C-150383, 2016-Ohio-3184, ¶ 15, citing *Morgan* at ¶ 37.  R.C. 2152.12(B)(3) provides that the "record shall indicate the specific factors that were applicable and that the court weighed."  *See also* Juv.R. 30(G) ("The order of transfer shall state the reasons for transfer.").

{¶ 24}  R.C. 2152.12(D) provides that a juvenile court shall consider the following factors, in addition to any other relevant factors, in favor of transferring a juvenile:

> (1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.
>
> (2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.
>
> (3) The child's relationship with the victim facilitated the act charged.
>
> (4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.
>
> (5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged,

allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

(6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

{¶ 25} R.C. 2152.12(E) provides that a juvenile court shall consider the following factors, in addition to any other relevant factors, against transferring a juvenile:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

## C. Analysis

{¶ 26} Before addressing appellant's arguments, we note the seriousness of this matter as outlined in the factual history. Regardless of the allegations in this case, however terrifying, it is the duty of this court to ensure that " '[j]ustice is even-handed and equally administered to all, irrespective of any and all considerations.' " *State ex rel. Clay v.*

*Cuyahoga Cty. Med. Examiner's Office*, 152 Ohio St.3d 163, 2017-Ohio-8714, ¶ 39, quoting *Koppelman v. Commr. of Internal Revenue*, 202 F.2d 955, 956 (3d Cir.1953) (Kalodner, J., dissenting). Constrained by the standard of review and mindful of the requirement under R.C. 2152.12(B)(3) that the trial court indicate the applicable factors that it weighed in reaching its amenability determination, we proceed with our review.

{¶ 27} In his assignment of error, appellant asserts the juvenile court's amenability decision is unreasonable and arbitrary. Appellant contends the juvenile court's findings with regard to the factors favoring transfer under R.C. 2152.12(D) and the factors disfavoring transfer under R.C. 2152.12(E) were legally and factually erroneous. For purposes of analysis, we consider the juvenile court's findings regarding each of the factors along with arguments specific to those factors raised on appeal.

**1. Factors in Favor of Transfer**

**a. <u>R.C. 2152.12(D)(1)</u>**

{¶ 28} Pursuant to R.C. 2152.12(D)(1), the juvenile court was required to consider whether the "victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act." Under this factor, the juvenile court found:

> The Court disagrees with the psychologists and probations [sic] finding that there are no victims in this case. This case came to the attention of law enforcement and the schools because [appellant] attempted to recruit and was successful in recruiting some co-conspirators in this act. The victims in this case may not have suffered physical harm but they indeed suffered psychological harm. They were placed in fear of harm and imminent danger in a terrorism [sic] attack.

(Sept. 6, 2017 Decision at 2.)

{¶ 29} Appellant argues the juvenile court erred in its analysis of this factor because there were no victims of the alleged act. In support of this argument, appellant contends the juvenile court failed to constrain its analysis to the "alleged act" as required by R.C. 2152.12(D)(1), but instead expanded the analysis to include "its own interpretation of what the act *would have been* in the event of an actual 'terrorism attack.' " (Emphasis sic.) (Appellant's Brief at 30.). Additionally, appellant argues evidence did not reflect that the attack was "*imminent.*" (Emphasis sic.) (Appellant's Brief at 30.)

{¶ 30} First, we note the term "victim" is not defined by R.C. 2152.12. Second, absent a statutory definition, we do not construe the term "victim" as narrowly as appellant does.

Although it is true appellant was stopped before he was able to carry out his plan, the record reflects that psychological harm was inflicted as a result of appellant's conspiracy. In a police report attached to the bindover packet, one of the children who reported appellant's conduct to police was "scared and concerned" as a result of overhearing appellant's discussion of his plan to conduct a school shooting. (Bindover Investigation Exhibit.) The student also reported being "disturbed" by witnessing appellant's school shooting diagram. Given the context of this case, we find this sufficient to support a finding of psychological harm. *See Pinkerton v. United States*, 328 U.S. 640, 644 (1946), quoting *United States v. Rabinowich*, 238 U.S. 78, 88 (1915) ("For two or more to confederate and combine together to commit or cause to be committed a breach of the criminal laws, is an offense of the gravest character, sometimes quite outweighing, in injury to the public, the mere commission of the contemplated crime."); *State v. Heath*, 170 Ohio App.3d 366, 2007-Ohio-536, ¶ 52 (8th Dist.) (finding in the context of a case in which the defendant hired a "hit man" to kill her husband that a " 'murder for hire' scheme, by its very nature, assumes harm or death will come to the victim").

{¶ 31} Next, although not a listed factor under R.C. 2152.12(D)(1), the record provides some support for the juvenile court's conclusion that the victims were in "imminent" danger. Here, appellant believed he had secured the cooperation of two co-conspirators. The assistant prosecutor stated appellant was preparing to "carry out the object of this conspiracy that he believed others had already agreed to, which was to shoot and kill as many people at Hilliard Davidson High School as possible." (Apr. 17, 2017 Tr. at 11-12.) Therefore, we cannot find the juvenile court abused its discretion in referring to "imminent" danger.

**b. R.C. 2152.12(D)(2)**

{¶ 32} Pursuant to R.C. 2152.12(D)(2), the juvenile court was required to consider whether the "physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim." Under this factor, the juvenile court found:

> The intended victims were high school students that would have been unable to protect themselves from an active shooter in the school. The students and teachers would have been vulnerable as [appellant] planned out a path through the school, the targets he would take and the escape route he would

use to exit the school. The Court finds that this exacerbated the psychological harm to the victims.

(Sept. 6, 2017 Decision at 2.)

{¶ 33} Appellant argues this factor did not apply because there were no identifiable victims. Appellant also argues the juvenile court erred in its analysis by failing to constrain its analysis to the act charged. As discussed in our analysis of the R.C. 2152.12(D)(1) factor, the record supported the juvenile court's analysis of the harm to the intended victims as a result of the alleged act. As a result, we find appellant's contentions regarding the R.C. 2152.12(D)(2) factor to be without merit.

c. <u>R.C. 2152.12(D)(3)</u>

{¶ 34} Pursuant to R.C. 2152.12(D)(3), the juvenile court was required to consider whether the "child's relationship with the victim facilitated the act charged." Under this factor, the juvenile court found:

> There's indication that [appellant] was bullied in school. This was his opportunity to get those who had bullied or taunted him for being different. He admittedly developed an ominous or threatening image and described himself as a "badass" during the investigative interview. He began to wear black clothes and leather duster with a skunk's scent in an effort to keep others at bay. He reported that [h]e wore clothes that made him look like a "school shooter." Therefore, the Court finds that his relationship with the victims facilitated the act charged.

(Sept. 6, 2017 Decision at 2.)

{¶ 35} Appellant contends there was no rational basis for the juvenile court to find this factor favored transfer because: (1) there were no victims, (2) the victims, if there were any, were the same individuals who bullied appellant, and (3) there was no evidence to support the conclusion that revenge for bullying was appellant's motive.

{¶ 36} Here, the record supports an inference that appellant's commission of the act charged was in response to bullying from his peers at school. Dr. Davis noted in his report that, according to appellant's parents, appellant "was picked on socially and developed a 'persona.' " (Davis Report at 8.) Additionally, children "would taunt [appellant] and say that he 'looked like a school shooter.' " (Davis Report at 8.) Dr. Dagenfield reported to Dr. Davis that appellant's identity was as a result of "apparently [being] bullied in the 7th

grade" and that "this was his strategy for keeping malcontents and other kids from antagonizing him."  (Davis Report at 10.)

{¶ 37}  In the bindover investigation, it was noted that "[t]here are varying but consistent reports of [appellant] being bullied at school."  (Bindover Investigation at 7.) Appellant "purposefully isolated himself by wearing dark clothes or presenting an ominous, or threatening image, a persona [appellant] himself described as being 'a badass' * * * during the bindover interview."  (Bindover Investigation at 7.)  The bindover investigation linked appellant's "reclusive school behavior" with bullying, noting appellant "seemed reluctant to admit anything that would make him appear as weak, and being subject to bullying would be detrimental to the image of being 'a badass' that he seems desperate to portray, particularly in social settings such as school and amongst peers where he feels socially inferior."  (Bindover Investigation at 7-8.)

{¶ 38}  Appellant drew a map containing a "gymnasium, cafeteria, library or another large room" and told witnesses it was a representation of the school auditorium.  (Bindover Investigation at 2.)  The plans included specific mention of the "[l]ast week of school assembly" and references to school shootings.  (Bindover Investigation at 2.)  Based on the foregoing, the juvenile court could reasonably conclude that appellant's relationship with the victims facilitated the act charged.

{¶ 39}  Appellant also asserts the juvenile court's reasoning was arbitrary because it relied on bullying to support the transfer under R.C. 2152.12(D)(3), but refused to rely on it in its analysis of R.C. 2152.12(E)(1) and (2) to support a finding of amenability.

{¶ 40}  In its analysis of R.C. 2152.12(E)(1), the court found that "[t]he victims had bullied [appellant] at some point.  There's no indication of the time period but the bullying was not considered serious."  (Sept. 6, 2017 Decision at 4.)  However, the court did not ultimately conclude whether the factor in R.C. 2152.12(E)(1) was applicable or not, as required by R.C. 2152.12(B)(3).  In its analysis of R.C. 2152.12(E)(2), the court found that "[t]here's no indication that [appellant] acted under provocation.  This plan was developed between 2015 and 2016.  He had multiple drafts of the plan, recruited accomplices, he had the physical evidence of the intent to carry out the threat."  (Sept. 6, 2017 Decision at 4.) Additionally, in its analysis of R.C. 2152.12(E)(8), the court appears to conclude the opposite of its finding under R.C. 2152.12(D)(3), stating that "[t]here's no indication that

bullying attributed to this act as he had already developed the persona of a school shooter." (Sept. 6, 2017 Decision at 5.)[1]

{¶ 41} The state suggests the court's reasoning can be explained by considering that "while bullying and antagonism could be found to 'provoke' some reaction, the juvenile court could conclude that it was not serious enough to actually provoke or induce conspiring to commit mass murder." (Appellee's Brief at 41.) Although the court was free to draw such a conclusion, we cannot infer the same based solely on the inconsistent findings in the judgment entry relating to R.C. 2152.12(D)(3), (E)(1), (E)(2), and (E)(8). "[A] court speaks only through its journal entries." *Infinite Sec. Solutions, L.L.C. v. Karam Properties II, Ltd.*, 143 Ohio St.3d 346, 2015-Ohio-1101, ¶ 29, citing *State ex rel. Worcester v. Donnellon*, 49 Ohio St.3d 117, 118 (1990). *See State v. Lytle*, 10th Dist. No. 13AP-866, 2015-Ohio-1133, ¶ 3, citing *State v. Miller*, 127 Ohio St.3d 407, 2010-Ohio-5705 (stating that "a trial court speaks through its journal and that any defects in the entry are paramount"). "Neither the parties nor a reviewing court should have to review the trial court record to determine the court's intentions," but instead "the entry must reflect the trial court's action in clear and succinct terms." *Infinite Sec. Solutions* at ¶ 29. Furthermore, as previously stated, R.C. 2152.12(B)(3) requires the juvenile court to indicate in the record which specific factors were applicable and weighed. Given the inconsistent statements regarding bullying and the fact that the juvenile court did not indicate whether R.C. 2152.12(E)(1) applied, we cannot meaningfully review whether or not the court's resolution of the R.C. 2152.12(D)(3) factor was a proper exercise of the court's discretion. *See Talley v. Talley*, 10th Dist. No. 15AP-812, 2016-Ohio-3533, ¶ 27, citing *Kaechele v. Kaechele*, 35 Ohio St.3d 93 (1988), paragraph two of the syllabus; *State v. Canada*, 10th Dist. No. 16AP-7, 2016-Ohio-5948, ¶ 18-20 (finding trial court committed prejudicial error by failing to include in decision and entry a sufficient explanation for its basis for discounting the credibility of sworn affidavits in support of the appellant's postconviction relief petition).

---

[1] We also note that in its analysis of R.C. 2152.12(D)(8), the court stated that "[t]here is no indication that Peer Rejection contributed to his escalation of his plan to commit the school shootings." (Sept 6, 2017 Decision at 4.)

### d. R.C. 2152.12(D)(4)

{¶ 42} Pursuant to R.C. 2152.12(D)(4), the juvenile court was required to consider whether the "child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity." Under this factor, the juvenile court found "[i]t was unclear from the record whether or not [appellant] was an active member of a White Supremacist [gang] or had any other gang affiliation. The psychologists opined that he is a low to moderate risk for aggressive behavior." (Sept. 6, 2017 Decision at 2.)

{¶ 43} Appellant argues the juvenile court was ambiguous about this factor, and we agree it is unclear whether the court found the factor favored transfer. Nevertheless, appellant does not assert the juvenile court erred with regard to this factor. Accordingly, we find the juvenile court did not err in its analysis of the factor under R.C. 2152.12(D)(4).

### e. R.C. 2152.12(D)(5)

{¶ 44} Pursuant to R.C. 2152.12(D)(5), the juvenile court was required to consider whether the "child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm." Under this factor, the juvenile court found:

> There is no indication that [appellant] had carried a firearm into the school but the record is clear that he did have access to firearms in the home. The record is also clear that [appellant] has knowledge of weapons and admitted in his PSI report that he took his mother to the range to teach her to shoot. He has an affinity for weapons. Given the nature of the seriousness of his charges, he still wants to pursue a career as a gun smith. The Court finds that this factor is not applicable as [appellant] did not use, display, brandish or indicate that he possessed a firearm.

(Sept. 6, 2017 Decision at 3.)

{¶ 45} Appellant asserts the record does not support he had access to firearms in the home. Appellant does not contend, however, the juvenile court erred in finding the factor under R.C. 2152.12(D)(5) was not applicable because he did not use, display, brandish, or indicate that he possessed a firearm. Accordingly, we find any error in the juvenile court's statement of facts to be harmless.

**f. R.C. 2152.12(D)(6)**

{¶ 46} Pursuant to R.C. 2152.12(D)(6), the juvenile court was required to consider whether "[a]t the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction."  The juvenile court found this factor was not applicable and appellant raises no challenge to this finding.  Accordingly, we find the juvenile court did not err with regard to its analysis of the factor under R.C. 2152.12(D)(6).

**g. R.C. 2152.12(D)(7)**

{¶ 47} Pursuant to R.C. 2152.12(D)(7), the juvenile court was required to consider whether the "results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system."  Under this factor, the juvenile court found:

> The Court released [appellant] on GPS EMD monitoring during the pendency of the case after he had been detained in the Juvenile Detention Center for 173 days. He had no outages or overt violations of the Court's orders. The probation officer and EMD monitor were in contact with him on a weekly basis. In their testimony or report to the writing officer, at least one of the witnesses felt that [appellant] was "creepy." He hovered over them when they were checking his computer to be sure that he had not been on any websites related to terrorism. There was some trepidation of the witnesses in monitoring [appellant]. However, the only treatment [appellant] has received has been with individual and family counseling since this case began. The Court has no history reported by [appellant] or his family of previous juvenile sanctions or programs.

(Sept. 6, 2017 Decision at 3.)

{¶ 48} Appellant asserts this factor does not apply because he had not been subject to any previous juvenile sanctions or programs.  Appellant also asserts that insofar as the juvenile court considered appellant's responses to supervision in the current case, it should have favored amenability as there was no evidence to support the court's findings.

{¶ 49} Here, it is unclear whether the juvenile court ultimately found this factor to be applicable.  Because the juvenile court failed in compliance with R.C. 2152.12(B)(3) to indicate whether this factor was applicable, we cannot meaningfully review whether or not the court's resolution of the R.C. 2152.12(D)(7) factor was a proper exercise of the court's

discretion.  *See Talley* at ¶ 27, citing *Kaechele* at paragraph two of the syllabus; *Canada* at ¶ 18-20.

**h. R.C. 2152.12(D)(8)**

{¶ 50}  Pursuant to R.C. 2152.12(D)(8), the juvenile court was required to consider whether the "child is emotionally, physically, or psychologically mature enough for the transfer."  Under this factor, the juvenile court found:

> [Appellant] is emotionally mature enough for the transfer. His mother indicated that he stopped sharing his emotional feelings with her around the age of 12. There's indication that his father teased him for crying and he developed a more "macho" personality. [Appellant] has never been diagnosed with any behavioral or emotional health disorders. He denied feeling suicidal or homicidal. However, in the JDC, [appellant] was on suicide protocol which was one of the factors the Court considered when he was ordered released on house arrest. This indicates a level of psychological maturity in that he denied during his interview being suicidal but used being suicidal to have counseling from his personal counselor while detained and ultimately used suicide as one of the factors the Court used in making a determination to issue an order for his release from the JDC. He scored a high rating in Peer Rejection and Dr. Davis testified that [appellant] is psychologically mature. There is no indication that Peer Rejection contributed to his escalation of his plan to commit the school shootings.

(Sept. 6, 2017 Decision at 3-4.)

{¶ 51}  Appellant disputes several of the juvenile court's findings under this factor as unsupported by the record.  First, appellant argues Dr. Davis did not testify that appellant was mature enough for transfer.  However, in his report, Dr. Davis stated the following:

> On the Sophistication Maturity Scale, [appellant's] raw score of 19 resulted in a T score of 69 that was in the 96th percentile and in the high range. Overall, he is a youth, who has developed age appropriate cognitive capacities (that is he knows right from wrong for example), is generally autonomous and who has a still emerging self-concept. He has adequate interpersonal skills for his age and can identify non-delinquent, non-violent problem solving alternatives.

(Davis Report at 21.)  As a result, we find the record sufficiently supports the juvenile court's finding regarding appellant's psychological maturity as determined by Dr. Davis.

{¶ 52} Second, appellant argues the juvenile court incorrectly found he had not been diagnosed with any behavioral or emotional health disorders. The state does not dispute appellant's contention, but instead responds that appellant's diagnoses were not serious and warranted little, if any, weight in assessing amenability. The state also argues the juvenile court considered appellant's mental health diagnoses elsewhere in its findings.

{¶ 53} In his report, Dr. Davis stated that four mental health diagnoses were "suggested," including: (1) "Unspecified Depressive Disorder," (2) "Social Anxiety Disorder," (3) "Disruptive Behavior Disorder Not Otherwise Specified," and (4) "Rule Out Autism Spectrum Disorder." (Davis Report at 15.) Additionally, Dr. Davis stated that, at Nationwide Children's Hospital Crisis Unit following appellant's arrest, appellant was diagnosed with "Disruptive Behavior Disorder NOS with a recommendation that an autism spectrum disorder be ruled out." (Davis Report at 10.) However, Dr. Davis found appellant "does not appear to have active symptoms [of] serious mental illness." (Davis Report at 22.) Dr. Davis noted that "there is not a consensus in the research as to the applicability and validity of diagnostic classification systems * * * to children and adolescents in particular." (Davis Report at 15.)

{¶ 54} Dr. Speicher-Bocija found that appellant "qualified for diagnoses of Depression, Posttraumatic Stress Disorder, Adjustment Disorder with Mixed Features, Unspecified Depressive Disorder, Social Anxiety Disorder, Disruptive Behavior Disorder Not Otherwise Specified and a rule out of Autism Spectrum Disorder." (Speicher-Bocija Report at 9.) Dr. Speicher-Bocija also stated that appellant was "not currently suffering from acute psychopathology associated with serious mental illness. He did not exhibit any clinical signs, symptoms, or behaviors that would be consistent with those usually seen in a serious mental illness such as Schizophrenia or Other Psychotic Disorder, Major Depression, Bipolar Disorder, or Dissociative Disorder." (Speicher-Bocija Report at 7.) Finally, Speicher-Bocija stated that appellant "does not currently exhibit or endorse any symptom of a serious mental illness. However he has qualified for mental health diagnoses that could be a focus of treatment. Further, additional assessment for autism spectrum disorder was recommended." (Speicher-Bocija Report at 11.)

{¶ 55} Consistent with its analysis of R.C. 2152.12(D)(8), the juvenile court in its analysis of R.C. 2152.12(D)(9) found that "[appellant] has no known mental health

diagnosis." (Sept. 6, 2017 Decision at 4.) Similarly, in its analysis of R.C. 2152.12(E)(7), the juvenile court found "[appellant] has no mental illness or intellectual disability based upon the psychological reports prepared for this hearing." (Sept. 6, 2017 Decision at 5.) However, as noted by the state, the juvenile court referred to Dr. Davis's findings with regard to appellant's mental health diagnoses in its consideration of the factor under R.C. 2152.12(E)(8). Specifically, the court stated that "Dr. Davis also offered diagnostic impressions of an Unspecified Depressive Disorder, Social Anxiety Disorder, Disruptive Behavior Disorder Not Otherwise Specified, and Rule Out Autism Spectrum Disorder." (Sept. 6, 2017 Decision at 5.) Thus, the juvenile court's findings under the R.C. 2152.12(D)(8) factor regarding whether appellant qualified for mental health diagnoses are inconsistent with its other findings, particularly those findings under the R.C. 2152.12(E)(8) factor, and unsupported by the record.

{¶ 56} Third, appellant argues the record does not support the juvenile court's finding that appellant was on suicide protocol. The state points to nothing in the record to support the juvenile court's findings on this point, and our independent review failed to reveal any evidence of the same.[2]

{¶ 57} Because of the juvenile court's inconsistent and unsupported findings, we are unable to determine whether the court's resolution of the R.C. 2152.12(D)(8) factor was a proper exercise of the court's discretion. As a result, on remand, the court must determine based on the facts in the record whether appellant is emotionally, physically, or psychologically mature enough for the transfer.

### i. R.C. 2152.12(D)(9)

{¶ 58} Pursuant to R.C. 2152.12(D)(9), the juvenile court was required to consider whether "[t]here is not sufficient time to rehabilitate the child within the juvenile system." Under this factor, the juvenile court found:

> [Appellant] had been developing his plan for more than one
> year. He has no known mental health diagnosis and there is no
> programming that will be of assistance in rehabilitating him in
> the juvenile system. There is no reported abuse history, drug or
> alcohol addiction, no educational difficulties or IEP is noted in

---

[2] We note the state's argument that "[g]iven the state of this record, the defense must have made off-the-record representations that the juvenile court has concluded were misleading on this point." (Appellee's Brief at 53-54.) As the state itself notes, there is nothing in the record to support such a conclusion. Therefore, we decline to consider the state's argument.

his educational file that would be ordered for rehabilitation in the juvenile system.

(Sept. 6, 2017 Decision at 4.)

{¶ 59} Appellant admits the juvenile court had discretion to disagree with the experts' conclusion that there was sufficient time to rehabilitate him within the juvenile system. However, appellant argues the juvenile court's finding was not supported by an accurate assessment of the facts and a rational review of the options. Specifically, appellant argues the juvenile court erred in basing its finding on the lack of appellant's mental health diagnoses and programming that would be of assistance in the juvenile system.

{¶ 60} As we previously noted in our review of the R.C. 2152.12(D)(8) factor, the record reflects that appellant qualified for several mental health diagnoses. Therefore, the court's statement that appellant has "no known mental health diagnosis" is not supported by the record and is inconsistent with the court's finding under the R.C. 2152.12(E)(8) factor. (Sept. 6, 2017 Decision at 4.)

{¶ 61} Furthermore, with regard to the availability of treatment options in the juvenile system, Dr. Davis noted that appellant "has at least a moderate to high probability, from a psychological standpoint, of positively responding to treatment within the juvenile justice system" and that "not all treatment options available within the juvenile justice system have been exhausted." (Emphasis sic.) (Davis Report at 24.) Dr. Speicher-Bocija found that appellant's diagnoses could be a focus of treatment and that "[t]here appears to be sufficient time to rehabilitate [appellant] within the juvenile system." (Speicher-Bocija Report at 11.) The juvenile court does not appear to have considered this evidence as there is no explanation for why it rejected the evidence and ultimately concluded "there is no programming that will be of assistance in rehabilitating him in the juvenile system." (Sept. 6, 2017 Decision at 4.) Based on the juvenile court's inconsistent and unsupported findings, we are unable to determine whether the court's resolution of the R.C. 2152.12(D)(9) factor was a proper exercise of the court's discretion. On remand, the court must determine based on the facts in the record whether there is not sufficient time to rehabilitate appellant within the juvenile system.

**2. Factors Against Transfer**

**a. R.C. 2152.12(E)(1)**

{¶ 62} Pursuant to R.C. 2152.12(E)(1), the juvenile court was required to consider whether the "victim induced or facilitated the act charged." Under this factor, the juvenile court found "[t]he victims had bullied [appellant] at some point. There's no indication of the time period but the bullying was not considered serious." (Sept. 6, 2017 Decision at 4.)

{¶ 63} Appellant argues the juvenile court's findings under this factor are inconsistent with its findings under the R.C. 2152.12(D)(3) factor and that such inconsistency renders the juvenile court's findings without a rational or logical basis. As discussed in our review of the R.C. 2152.12(D)(3) factor, we found the court's statements regarding bullying to be inconsistent. Here, it is unclear whether the juvenile court found this factor was applicable or how much weight it accorded such factor. As a result, we cannot meaningfully review the juvenile court's resolution of the R.C. 2152.12(E)(1) factor.

**b. R.C. 2152.12(E)(2)**

{¶ 64} Pursuant to R.C. 2152.12(E)(2), the juvenile court was required to consider whether the "child acted under provocation in allegedly committing the act charged." Under this factor, the juvenile court found "[t]here's no indication that [appellant] acted under provocation. This plan was developed between 2015 and 2016. He had multiple drafts of the plan, recruited accomplices, he had the physical evidence of the intent to carry out the threat." (Sept. 6, 2017 Decision at 4.)

{¶ 65} Appellant argues the juvenile court's reasoning does not apply to this factor. Additionally, appellant again argues the juvenile court erred by failing to examine bullying in its consideration of this factor. Here, the record supports the juvenile court's finding that the plan was developed over a significant period of time. However, as previously discussed in our analysis of R.C. 2152.12(D)(3), the court's findings under R.C. 2152.12(E)(2) appear to be inconsistent with its other findings under R.C. 2152.12(D)(3), (E)(1), and (E)(8). As a result, without further explanation from the court,[3] we cannot determine whether the court's resolution of this factor was a proper exercise of the court's discretion.

---

[3] We note that on remand the juvenile court could reasonably conclude that any provocation was not serious enough to provoke the act charged, if such conclusion is supported by the evidence in the record.

### c. R.C. 2152.12(E)(3)

{¶ 66} Pursuant to R.C. 2152.12(E)(3), the juvenile court was required to consider whether the "child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person."  Under this factor, the juvenile court found "[appellant] is the principal actor in the act charged." (Sept. 6, 2017 Decision at 4.)

{¶ 67} Appellant argues there is no evidence to support the juvenile court's conclusion that he was the principal actor.  Contrary to appellant's argument, the record provides ample support for the juvenile court's finding that appellant was the principal actor in the charged act.  The bindover investigation report submitted to the juvenile court reflects that appellant drew a map of the school, planned for supplies, provided the map of the plan to John Doe 1 and John Doe 2, and solicited John Doe 1 and John Doe 2 to participate in the plan to commit murder in furtherance of the conspiracy. These statements were also supported by a police report attached to the bindover investigation report.  As a result, we cannot find the juvenile court erred in its consideration of the R.C. 2152.12(E)(3) factor.

### d. R.C. 2152.12(E)(4)

{¶ 68} Pursuant to R.C. 2152.12(E)(4), the juvenile court was required to consider whether the "child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged."  Under this factor, the juvenile court found "[a]lthough [appellant] did not cause physical harm to anyone, the Court has more than reasonable cause to believe that physical harm and even death would have occurred if he had been able to carry out his plan."  (Sept. 6, 2017 Decision at 4.)

{¶ 69} Appellant argues the juvenile court erred for three reasons.  First, appellant argues there was no evidence that anyone suffered harm.  However, the juvenile court found that appellant did not cause physical harm.  As a result, we find no error in the juvenile court's reasoning.

{¶ 70} Second, appellant asserts the juvenile court erred in assessing this factor based on what would have happened if appellant had completed his plan, rather than the

act charged.  We cannot agree with appellant that this factor is inapplicable to him merely because he was stopped prior to the completion of his plan.

{¶ 71} Third, appellant argues the juvenile court incorrectly based its finding on what the *court* had reasonable cause to believe, as opposed to what *appellant* had reasonable cause to believe.  It is true the juvenile court did not track the statutory language and instead focused on what the court had reasonable cause to believe rather than what appellant had reasonable cause to believe.  Where a statute is clear and unambiguous, it is the duty of a court to apply the statute as written.  *State v. Vanzandt*, 142 Ohio St.3d 223, 2015-Ohio-236, ¶ 7, quoting *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545 (1996) (" 'If the meaning of the statute is unambiguous and definite, it must be applied as written and no further interpretation is necessary.' ").  Furthermore, while parts of the record could be construed to support a conclusion that appellant had reasonable cause to believe physical harm would occur in committing the charged act, another part of the record from the same expert report could be construed otherwise.

{¶ 72} In his report, Dr. Davis noted that appellant stated "he has significant remorse for his actions and disclaims violent intent."  (Davis Report at 18.)  Additionally, Dr. Davis found appellant "is a youth, who has developed age appropriate cognitive capacities (that is he knows right from wrong for example), is generally autonomous and who has a still emerging self-concept.  He has adequate interpersonal skills for his age and can identify non-delinquent, non-violent problem solving alternatives."  (Davis Report at 21.)  However, Dr. Davis also stated "[i]t is highly likely in my opinion that his very poor social skills and social anxiety (and/or Autism) significantly contributed to the behaviors that resulted [in] his involvement in the alleged instant offenses and c*aused him to not fully appreciate the seriousness of the act or how others would view it as very serious and threatening*, if the court accepts his response to the charges."  (Emphasis added.)  (Davis Report at 23.)  It is the responsibility of the juvenile court in the first instance to resolve conflicts in the evidence.  *See generally Dannaher v. Newbold*, 10th Dist. No. 03AP-155, 2004-Ohio-1003, ¶ 137; *State v. Adams*, 9th Dist. No. 05CA008685, 2005-Ohio-4360, ¶ 15; *State v. S.M.*, 10th Dist. No. 14AP-701, 2015-Ohio-1916, ¶ 31.  Accordingly, we find the juvenile court erred in its consideration of the R.C. 2152.12(E)(4) factor.  The trial court

must apply the correct standard and in so doing must consider the applicable evidence and explain its resolution of the same.

**e. R.C. 2152.12(E)(5)**

{¶ 73} Pursuant to R.C. 2152.12(E)(5), the juvenile court was required to consider whether the "child previously has not been adjudicated a delinquent child." Under this factor, the juvenile court found "[appellant] has not previously been adjudicated a delinquent child." (Sept. 6, 2017 Decision at 4.) Appellant does not dispute this finding.

**f. R.C. 2152.12(E)(6)**

{¶ 74} Pursuant to R.C. 2152.12(E)(6), the juvenile court was required to consider whether the "child is not emotionally, physically, or psychologically mature enough for the transfer." Under this factor the juvenile court found "[appellant] is emotionally, physically and psychologically mature enough for the transfer." (Sept. 6, 2017 Decision at 4.) As discussed in our review of R.C. 2152.12(D)(8), the juvenile court made inconsistent and unsupported findings regarding appellant's mental health diagnoses and his status on suicide patrol in determining whether appellant is emotionally, physically, or psychologically mature enough for the transfer. Consistent with our review of the trial court's findings under the R.C. 2152.12(D)(8) factor, and given the lack of additional findings in this section, the juvenile court must on remand determine whether appellant is not emotionally, physically, or psychologically mature enough for the transfer under R.C. 2152.12(E)(6).

**g. R.C. 2152.12(E)(7)**

{¶ 75} Pursuant to R.C. 2152.12(E)(7), the juvenile court was required to consider whether the "child has a mental illness or intellectual disability." Under this factor, the juvenile court found "[appellant] has no mental illness or intellectual disability based upon the psychological reports prepared for this hearing." (Sept. 6, 2017 Decision at 5.) Appellant asserts this finding is not supported by the record. As previously noted in our discussion of R.C. 2152.12(D)(8), the record reflects appellant qualified for several mental health diagnoses and the court's finding is inconsistent with its finding under the R.C. 2152.12(E)(8) factor. Accordingly, the juvenile court's finding under the R.C. 2152.12(E)(7) factor is inconsistent with its other findings and not supported by the record.

**h. R.C. 2152.12(E)(8)**

{¶ 76} Pursuant to R.C. 2152.12(E)(8), the juvenile court was required to consider whether "[t]here is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety." Under this factor, the juvenile court made the following findings:

> Both Dr. Davis and Dr. [Speicher]-Bocija concluded that [appellant] is amenable to treatment in the juvenile justice system. However, the Court reviewed *State v. Marshall*, 2016-Ohio-3184, where the trial court had made the decision to sustain the motion to relinquish when the psychologist had opined that the juvenile was amenable to treatment and the Court found that he was not. The trial court's ruling was affirmed in that case. A juvenile court in making an amenability determination is entitled to disagree with the opinion of a medical expert and may take into account the severity of the offenses when considering whether a juvenile is mature enough for transfer and whether enough time exists to rehabilitate in the juvenile-justice system. *See State v. Johnson*, 2015-Ohio-96, 27 N.E.3d 9 ¶ 40 (8th Dist.); *Morgan*, 10th Dist. Franklin No. 13AP-620, 2014-Ohio-5661, at ¶ 37 (holding that a juvenile court is not bound by an expert opinion).
>
> The Court finds that there is not sufficient time to rehabilitate [appellant] and provide a reasonable assurance of public safety. [Appellant] is currently on GPS EMD monitor on house arrest. It is not conceivable that he can be maintained in that state. It's important to note that he concocted this plan while in his parents' home, on his home computer, made maps or plans th[r]ough electronic communication with peers, has a fixation on violence, violent acts, violent people, such as Timothy McVey [sic] and Charles Manson, homegrown terrorists, violent groups such as Nazis and the KKK, and numerous prior-school shooters. He had acquired a bullet proof vest and a gas mask for his attack. He had dwelled on his plan for the span of a year although the drawings/plans were considered recently done.
>
> Dr. Davis opined that there was no evidence or indication of an increasing imperative to commit the act. There's no indication that bullying attributed to this act as he had already developed the persona of a school shooter. There's no psychological break from reality. Dr. Davis also cautioned that the threat assessment model did accurately predict the allegations, even though the assessment is a measure of immediacy and different from a longer term predictive assessment.

Dr. Davis also offered diagnostic impressions of an Unspecified Depressive Disorder, Social Anxiety Disorder, Disruptive Behavior Disorder Not Otherwise Specified, and Rule Out Autism Spectrum Disorder. The Court finds that none of these disorders rise to a level of incompetence to understand the actions that he has committed, to assist with his own defense or understand the nature of these proceedings.

Dr. [Speicher]-Bocija conducted the same assessments as Dr. Davis and opined that [appellant] had a high score on the Sophistication-Maturity scale of the RSTI. She opined that [appellant] displayed a tendency to direct his high level of Sophistication-Maturity to a criminologic end in sustaining the delinquency charge. Also she noted that [appellant] called the diagram he created and its implicit threat a joke. Further she opined, based upon the Virginia Model for Student Threat Assessment, [appellant] should be considered as a "high threat" level. She recommended that the Court consider imposing a serious youthful offender designation because he is highly motivated to avoid adult sanctions. Franklin County Prosecutor's Office did not file for a Serious Youthful Offender specification, therefore, the Court cannot consider this option.

(Sept. 6, 2017 Decision at 5-6.)

{¶ 77} Appellant argues the juvenile court erred in its consideration of this factor because it did not make a specific finding about the seriousness of the offense, unlike the cases to which it cited. Furthermore, appellant argues the juvenile court did not offer specific facts or reasoning about why the experts were incorrect. Finally, appellant argues the juvenile court failed to analyze the availability of any programs and appellant's response while under supervision.

{¶ 78} Appellant is correct that the juvenile court in its consideration of the R.C. 2152.12(E)(8) factor did not *explicitly* make a finding specifically regarding the severity of the offense in this case.[4] Nevertheless, a reading of the entirety of the juvenile court's findings under R.C. 2152.12(E)(8) reveals the trial court did consider the severity of the offense. Specifically, the court found that appellant "concocted this plan while in his

---

[4] In *Marshall*, the court stated that "a juvenile court in making an amenability determination is entitled to disagree with the opinion of a medical expert and may take into account the severity of the offenses when considering whether a juvenile is mature enough for transfer and whether enough time exists to rehabilitate in the juvenile-justice system." *Id.* at ¶ 21. We note that a juvenile court's determination to reject a medical expert's opinion is different from erroneously finding that no mental health diagnosis was made when the record reflects otherwise.

parents' home, on his home computer, made maps or plans th[r]ough electronic communication with peers, has a fixation on violence, violent acts, violent people, such as Timothy McVey [sic] and Charles Manson, homegrown terrorists, violent groups such as Nazis and the KKK, and numerous prior-school shooters. He had acquired a bullet proof vest and a gas mask for his attack. He had dwelled on his plan for the span of a year although the drawings/plans were considered recently done." (Sept. 6, 2017 Decision at 5.). Therefore, considering the entirety of the juvenile court's findings, we cannot find the juvenile court committed prejudicial error by failing to explicitly make a finding regarding the severity of the offense in its resolution of the R.C. 2152.12(E)(8) factor.[5]

{¶ 79} However, as discussed in our analysis of the R.C. 2152.12(D)(3) factor, the juvenile court's determination in this section that "[t]here's no indication that bullying attributed to this act as he had already developed the persona of a school shooter" is inconsistent with its other findings related to bullying. (Sept. 6, 2017 Decision at 5.) Additionally, as previously discussed in our analysis of the R.C. 2152.12(D)(8) factor, the juvenile court's determination in this section related to appellant's mental health diagnoses is inconsistent with its other findings. Based on the lack of clarity resulting from the court's inconsistent findings, we are unable to determine whether the juvenile court properly exercised its discretion in analyzing the R.C. 2152.12(E)(8) factor.

## D. Conclusion

{¶ 80} In making its amenability determination, the juvenile court was required to "indicate the specific factors that were applicable and that the court weighed." R.C. 2152.12(B)(3). Here, in multiple instances as outlined above, it is unclear from the juvenile court's decision which factors it found to be applicable in favor of or against transfer. Additionally, in multiple instances, the juvenile court's findings are either inconsistent with its own findings elsewhere in the decision or not supported by the record. Finally, as to one factor, the court applied the incorrect standard. Because the juvenile court's decision fails to comply with R.C. 21512.12(B)(3) and lacks sufficient clarity to enable meaningful appellate review, we cannot determine whether any errors in its determination were prejudicial. As a result, we must remand this matter for the juvenile court to apply the

---

[5] Furthermore, we note the plain language of R.C. 2152.12(E)(8) does not specifically require a court to make a finding regarding the severity of the offense, although such a finding may be informative.

proper standard, consider the evidence and weigh the same, resolve inconsistencies in its findings, and properly journalize its findings.  However, in so remanding, we recognize the seriousness of conduct in question and specifically make no determination as to whether appellant is amenable to rehabilitation in the juvenile system.  Accordingly, appellant's assignment of error is sustained.

## IV. Disposition

{¶ 81} Having sustained appellant's sole assignment of error, we reverse the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, and the General Division and remand this matter to the Juvenile Branch for further proceedings consistent with law and this decision.

*Judgments reversed;*
*cause remanded.*

BROWN and SADLER, JJ., concur.